**STAMICARBON, N.V., Appellant,**

v.

**AMERICAN CYANAMID COMPANY, Appellee.**

**No. 254, Docket 74-1960.**

United States Court of Appeals, Second Circuit.

Argued Sept. 12, 1974.

Decided Oct. 4, 1974.

John E. Haigney, New York City (Ide & Haigney, Ronald M. Glick, New York City, of counsel), for appellant Stamicarbon, N.V.

Samuel W. Murphy, Jr., New York City (Donovan, Leisure, Newton & Irvine, Kevin D. Brenan,

P. Michael Anderson, New York City (Stephen T. Waimey, Law Student, of counsel), for appellee American Cyanamid Co.

Thomas E. Kauper, Asst. Atty. Gen., Dept. of Justice, Washington, D.C. (Carl D. Lawson, Robert B. Nicholson, Attys, on the brief), as amicus curiae urging affirmance.

Before KAUFMAN, Chief Judge, and SMITH and TIMBERS, Circuit Judges.

IRVING R. KAUFMAN, Chief Judge:

James Madison probably did not suppose, on suggesting to the House of Representatives its inclusion in the Bill of Rights,[1] that the right to a public trial would one day conflict with someone's interest in concealing a method for producing a triamino derivative of symmetrical triazine. It is not surprising then, that he gave no advice on how properly to resolve the controversy with which we are now presented. Stamicarbon, N.V. [Stamicarbon], a Netherlands corporation, appeals to us from an order denying its motion for a preliminary injunction to prevent disclosure of its trade secrets by American

---

1. I Annals of Congress, June, 8, 1789, *reproduced in* II B. Schwartz, The Bill of Rights: A Documentary History, 1027 (1971).

Cyanamid Co. [Cyanamid], the defendant in a criminal contempt proceeding which has been continued by Judge Brieant pending this appeal. We affirm.

## I. FACTS

The rather improbable series of events which culminated in this action began a decade ago, with the entry of a consent decree against Cyanamid for antitrust violations [2] in the production of melamine.[3] The decree prohibited Cyanamid from producing more than 30 million pounds of melamine annually for ten years,[4] unless the production capacity of American competitors not in conspiracy with Cyanamid should in the interim increase by 25 million pounds. Imports for the preceding year were to be included in the computation of Cyanamid's production for any given year. The decree also forbade Cyanamid to expand its production capacity beyond 30 million pounds annually during the ten-year period.

The decree was modified in 1969 to permit Cyanamid to expand its production capacity.[5] At its new facility Cyanamid employed a secret process, acquired from Stamicarbon by license, for producing melamine from urea and ammonia rather than the more commonly used dicycyanamide. Article III of the licensing agreement provided:

> Client [Cyanamid] shall treat all Stamicarbon Know-How furnished to Client under this agreement as strictly confidential and shall use its rea-

sonably best efforts to prevent disclosure thereof to third parties.

In March 1974 the United States moved by order to show cause to hold Cyanamid in criminal contempt for violation of the 1964 consent decree. The Government indicated that it would demand a fine in excess of $500 for the alleged violation.[6] It claimed that the nonconspiratorial American melamine production capacity had not increased by 25 million pounds as of January 1, 1973, and that Cyanamid had nonetheless produced more than 30 million pounds in 1972, and imported 569,320 pounds in 1971. Some of the information upon which the Government relied was drawn from a report, made in 1973 by J. Lisle Reed, entitled "U.S. Plant Capacity for the Production of Melamine, An Independent Study Conducted for the Department of Justice and American Cyanamid, Inc."

Since Cyanamid admits that it produced 33,625,200 pounds of melamine in 1972, the only issue in the contempt trial will be whether the production capacity of Cyanamid's three American competitors increased by 25 million pounds beween the effective date of the decree and December 31, 1972. The Government will attempt to show, through the testimony of J. Lisle Reed and officers of the three companies, that Cyanamid's competitors have actual production capacities which are less than their designed outputs because of human and mechanical shortcomings in their production processes.[7] Two of

---

2. Sherman Act §§ 1, 2, 15 U.S.C. §§ 1, 2 (1970); Clayton Act § 7, 15 U.S.C. § 18 (1970).

3. Melamine is a compound used in the manufacture of melamine resins, from which are produced adhesives and coatings for certain plastic products.

4. The decree specified that the ten-year period was to commence on the date of disposition of Cyanamid's Willow Island facility. Willow Island was sold to Fisher Melamine Corp. on November 1, 1964.

5. The decree was again modified on two subsequent occasions. On October 10, 1973, the

limitation on production for that year was raised to 44 million pounds. On February 13, 1974 Cyanamid was given permission to produce 50 million pounds through October 31 of this year, when the original consent decree will expire.

6. Cyanamid waived its right to a jury trial.

7. Cyanamid will attempt to prove, among other things, that the decree contemplates an increase of 25 million pounds in designed capacity, and that the actual capacity relied upon by the Government is irrelevant.

those competitors—Premier Petrochemical Co. [Premier] and Melamine Chemicals, Inc. [MCI]—are licensees of Stamicarbon, and use its secret process for making melamine under contracts similar to that signed by American Cyanamid. On May 8, 1974 Cyanamid for the first time obtained from the Government a copy of the report of J. Lisle Reed, under a stipulation and order which provided:

If said report, documents or information contained therein are used in conjunction with the trial of this case, they shall be utilized in a manner which will maintain the confidentiality of the sensitive commercial or proprietary information contained therein, subject to further order by the Court.

Three days before the contempt trial was scheduled to begin, MCI moved that its testimony relating to production processes be received in camera, in order to maintain the secrecy required of MCI by Stamicarbon's licensing agreement. The Government agreed to the procedure but Cyanamid objected, and the district judge refused to order in camera proceedings without Cyanamid's consent. The following day Stamicarbon commenced this independent action before the presiding judge in the contempt trial. The injunction it sought would prevent Cyanamid from disclosing Stamicarbon secrets by requiring receipt of evidence relating to those secrets in camera. The complaint alleged that Cyanamid was required pursuant to its licensing agreement with Stamicarbon to consent to such a procedure.

On July 15, 1974, the day the contempt trial was to begin, a hearing was held on Stamicarbon's application for a preliminary injunction. The district judge failed to make any finding respecting the contract or the applicability of its provisions, but held that it had "to balance the right to a public trial on the one hand with the right to have the secrets preserved on the other . . . ." Finding that Stamicarbon would suffer irreparable injury from disclosure, the district judge nonetheless indicated that it was unlikely that the trial would elicit the evidence sought to be protected. He concluded "as a matter of law" that he "lack[ed] power under the circumstances of this case" to compel Cyanamid against its wishes to submit to in camera proceedings.[8] The criminal contempt trial was then continued so that Stamicarbon could appeal the denial of the preliminary injunction.

## II. ABUSE OF DISCRETION

In denying the application for a preliminary injunction, the district court found that Stamicarbon would suffer irreparable injury if its secret process were in fact disclosed. The court indicated doubt, however, that relevant evidence at trial would touch upon the salient features of that process. Thus the injury alleged by Stamicarbon may well be no more than speculative. It is well established that a party wishing to establish its right to a preliminary injunction must demonstrate either a probability that it will succeed on the merits coupled with a threat of irreparable injury, or a balance of hardship decidedly in its favor together with a serious question regarding the merits of the underlying action. Pride v. Community School Bd. of Brooklyn, N.Y., Dist. #18, 488 F.2d 321, 324–325 (2d Cir. 1973); Gulf & Western Indus. Inc. v. Great Atlantic & Pacific Tea Co., Inc. 476 F.2d 687 (2d Cir. 1973); Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738 (2d Cir. 1953). A district court's decision to deny a preliminary injunction, after an assessment of these factors, will be overturned only where

---

8. In an effort to find a procedure satisfactory to all parties, the district judge suggested that Stamicarbon be allowed to attend the contempt trial, to indicate to the court whenever evidence was being elicited which could divulge its secrets. The court would then exclude the evidence if it were not relevant. Cyanamid agreed to this proposal but both Stamicarbon and the Government objected.

there has been an abuse of discretion. Société Comptoir de l'Industrie etc. v. Alexander's Dept. Stores, Inc., 299 F.2d 33, 35 (2d Cir. 1962); Huber Baking Co. v. Stroehmann Bros. Co., 208 F.2d 464 (2d Cir. 1953); 7 Moore's Federal Practice ¶ 65.04[2] (1974). We are unable to say, upon the record before us that Judge Brieant abused his discretion in finding the threat of irreparable injury insufficiently probable to justify the award of interim relief to Stamicarbon.

■■ There is a further reason for our hesitance in upsetting the decision of the district court in this case. A determination of the propriety of interim injunctive relief cannot always be made simply by reference to the interests of the parties before the court. "Courts of equity may, and frequently do, go much further both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved." Virginian Ry. Co. v. System Federation, 300 U.S. 515, 552, 57 S.Ct. 592, 601, 81 L.Ed. 789 (1937). To be effective, an injunction would require participation by Stamicarbon in the underlying contempt trial, so that the evidence which should be taken in camera could be identified. Such monitoring of a criminal proceeding ought not lightly to be imposed upon the court and the parties, even if Cyanamid's right to a public trial may be subordinated to Stamicarbon's interests. For both the defendant and the public—on whose behalf the consent decree is being enforced—deserve that prosecutions be conducted with dispatch, and without danger of mishap. Before running the risk of miscarriage, we would require a convincing indication from the district judge that the need repeatedly to pass on the merits of claims of secrecy, coupled with the possibly frequent shuttling between public and in camera proceedings, would not prejudice the fair and expeditious conduct of the criminal contempt trial.

## III. WAIVER

Stamicarbon raises on appeal two distinct claims of waiver which we must decide without reference to the abuse of discretion standard. It is alleged that Cyanamid's consent in the licensing agreement to "treat all Stamicarbon Know-How furnished . . . under this agreement as strictly confidential and . . . [to] use its reasonably best efforts to prevent disclosure" implies a waiver of its right to a public trial with regard to the secret information sought to be protected here. Moreover, Stamicarbon suggests for the first time on appeal that Cyanamid's agreement in the stipulation and order of May 8, 1974 to "maintain the confidentiality of the . . . information contained [in the report of J. Lisle Reed]" implies a similar waiver. We reject both claims.

■ Although the district court made no express findings, its decision that it could not order in camera proceedings without Cyanamid's consent necessarily implies a rejection of any waiver claim based upon the terms of the contract. Nevertheless, we decline to rest our holding upon that inference alone, since it is proper for us to proceed upon our own interpretation of the written contract. Emor, Inc. v. Cyprus Mines Corp., 467 F.2d 770 (3d Cir. 1972); University Hills, Inc. v. Patton, 427 F.2d 1094 (6th Cir. 1970); Eddy v. Prudence Bonds Corp., 165 F.2d 157, 163 (2d Cir.) (L. Hand, J.), cert. denied, 333 U.S. 845, 68 S.Ct. 664, 92 L.Ed. 1128 (1948).

■ In deciding the effect of an alleged contractual waiver, the Supreme Court recently stated that "in the civil no less than the criminal area, 'courts indulge every reasonable presumption against waiver'" of constitutional rights.[9] Fuentes v. Shevin, 407 U.S.

9. The licensing agreement provided that it should "be construed in accordance with the law" of New Jersey. It goes without saying, however, that the New Jersey standard for waiver of a federal constitutional right, which this provision presumably incorporated, can-

67, 94 n.31, 92 S.Ct. 1983, 2001, 32 L.Ed. 2d 556 (1972). We find that the contractual secrecy provision relied upon by Stamicarbon falls far short of establishing with the requisite clarity, *see* Fuentes, *supra,* at 95–96, 92 S.Ct. 1983, any waiver by Cyanamid of its right to a public trial. The licensing agreement does not impose an absolute duty of non-disclosure on Cyanamid. Instead, it specifies that only "reasonably best efforts" need be made. If the word "reasonably" in that requirement is to have meaning, however, it must at a minimum excuse Cyanamid from a duty to forego a constitutionally protected right. Moreover, the licensing agreement was signed more than four years before the contempt action was initiated against Cyanamid. It is difficult to suppose that the rather extraordinary circumstances which here threaten disclosure could have been in the contemplation of Cyanamid and Stamicarbon at the time they signed the licensing agreement.

■ Stamicarbon asserts that it failed to raise in the district court the claim that a waiver was implied by Cyanamid's agreement to the stipulation and order of May 8, since it did not learn of the existence of that order until after the denial of its motion for a preliminary injunction. Under these circumstances, it may raise the claim on appeal. *Cf.* F.R.Civ.P. 60(b); Triumph Hosiery Mills, Inc. v. Triumph International Corp., 191 F.Supp. 937, 938 (S.D.N.Y.1961), rev'd on; other grounds, 308 F.2d 196 (2d Cir. 1962). There are, however, two difficulties with this assertion.

Although it appears clear that the report contains information gathered from Premier and MCI about Stamicarbon's secret production process, Stamicarbon offers no indication of its character or extent. Since it may well be that the study contains only some, and perhaps none, of the evidence Cyanamid would seek to elicit at trial, it would be difficult to say that Cyana-

mid's agreement to keep the report confidential implied a waiver of the right to a public trial regarding all Stamicarbon trade secrets. Stamicarbon alleges that Cyanamid did not know what was in the report when it was received from the Government, and that the promise of confidentiality made in advance must thus be construed as a waiver of the right to a public trial regarding anything that could have been contained therein. But it is well established that "[w]aivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." Brady v. United States, 397 U.S. 742, 748, 90 S.Ct. 1463, 1469, 25 L.Ed.2d 747 (1970). Thus, if Stamicarbon is correct in claiming that Cyanamid did not know what was contained in the report, Cyanamid cannot be said "knowingly" and with "awareness of the relevant circumstances" to have waived its right to a public trial.

There is a second flaw in this latter claim of waiver. The order of May 8 provides that its provisions concerning secrecy are "subject to further order by the Court." Stamicarbon has offered no background relating to this provision. It could well be, for example, that Cyanamid's agreement to confidentiality was conditioned on use of procedures like those to which it later agreed—assistance of Stamicarbon at trial for the limited purpose of objecting to damaging evidence—and that the order was expressly made subject to revision in case such procedures were not acceptable to Stamicarbon. In the face of such uncertainty surrounding the order, it is impossible to say that Cyanamid agreed to in camera proceedings.

## IV. THE CRIMINAL CONTEMPT TRIAL

■ Although we affirm the denial of the preliminary injunction, we feel

---

not be less stringent than the corresponding federal rule. Boykin v. Alabama, 395 U.S.

238, 243, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969).

we should offer some guidance as to the conduct of the criminal contempt trial. The course of those proceedings may show that the revelation which now seems too improbable to warrant injunctive relief must in fact be made if relevant evidence is not to be excluded.[10] There are indications in the statement accompanying the denial below which lead us to believe that, even if Judge Brieant had found more likely the danger of disclosure, he believed he was without power to grant the relief requested. We believe he does have the power at least partially to restrict access to the contempt proceedings when testimony which would reveal Stamicarbon's secrets is received.

Although the right to a public trial has been recognized in this country at least since 1677, *see* Concessions and Agreements of West New Jersey, chap. XXIII, *reproduced in* I B. Schwartz, The Bill of Rights: A Documentary History 129 (1971), and has governed criminal proceedings in the federal courts since ratification of the Bill of Rights in 1791, we have only recently begun to probe the outer limits of its force and purpose. Note, The Accused's Right to A Public Trial, 49 Colum.L.Rev. 110, 111 (1949). Unlike the right to a trial by jury, or the privilege against self-incrimination, strict enforcement of the accused's demand for public proceedings can occasionally infringe upon other important interests. Some, of course, are personal to the defendant. In such cases the strong policy against curtailment of publicity will yield to his paramount concern. United States v. Sorrentino, 175 F.2d 721, 723–724 (3d Cir.), cert. denied, 338 U.S. 868, 70 S.Ct. 143, 94 L.Ed. 532 (1949). *See, e. g.,* Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16

L.Ed.2d 600 (1966). On occasions, however, attendance at criminal trials by the general public will be barred even against the wishes of the accused, in order to implement policies whose importance outweighs the danger of a miscarriage of justice which may attend judicial proceedings carried out in even partial secrecy. This court recently recognized, for example, that the public interest in maintaining the confidentiality of airline "skyjack profiles" may justify the exclusion not only of the public, but of the defendant himself from a limited portion of a suppression hearing. United States v. Bell, 464 F.2d 667 (2d Cir.), cert. denied, 409 U.S. 991, 93 S.Ct. 335, 34 L.Ed.2d 258 (1972). *Cf.* United States v. Clark, 475 F.2d 240, 246 (2d Cir. 1973). It is said that the public also has an interest, which may conflict with that of the accused, in assuring that criminal trials proceed without interruption or improper influence. Effectuation of this concern has at times required the exclusion of the public or of a defendant's friends from the courtroom when they were thought to pose a threat to orderly proceedings, United States ex rel. Orlando v. Fay, 350 F.2d 967 (2d Cir. 1965), cert. denied, 384 U.S. 1008, 86 S.Ct. 1961, 16 L.Ed.2d 1021 (1966), or to full and honest testimony by Government witnesses. United States ex rel. Bruno v. Herold, 408 F.2d 125 (2d Cir. 1969), cert. denied, 397 U.S. 957, 90 S.Ct. 947, 25 L.Ed.2d 141 (1970).

It is interesting that the right to a public trial has also been limited on occasion to favor an interest held, not by the defendant or by the public at large, but by a private individual. It has long been recognized, for example, that the need to protect young complaining witnesses in rape cases against embarrassment, harassment and loss of reputation will suffice to invoke the shelter of

---

10. We assume, since the damaging evidence is most likely to be elicited—if at all—upon examination of Stamicarbon's other licensees, that the participation by Premier and MCI in the trial would adequately serve to alert the

district judge of imminent disclosure. Should this assumption prove unwarranted, we do not foreclose the possibility that Stamicarbon may be asked to advise the court about testimony which may touch upon its interests.

limited privacy upon criminal proceedings. *See, e. g.,* Harris v. Stephens, 361 F.2d 888 (8th Cir. 1966), cert. denied, 386 U.S. 964, 87 S.Ct. 1040, 18 L.Ed.2d 113 (1967); United States v. Geise, 158 F.Supp. 821, 824, 17 Alaska 461 (1958), aff'd, 262 F.2d 151 (9th Cir. 1958), cert. denied, 361 U.S. 842, 80 S.Ct. 94, 4 L.Ed.2d 80 (1959). *Cf.* N.Y.Jud.Law, § 4 (McKinney 1968); 9A Mass.Laws Anno., c. 278 §§ 16A, 16B; Melanson v. O'Brian, 191 F.2d 963 (1st Cir. 1951); Reeves v. State, 264 Ala. 476, 88 So.2d 561, cert. dismissed, 355 U.S. 368, 78 S.Ct. 363, 2 L.Ed.2d 352 (1957); 21 Halsbury's Laws of Eng., pt. 7, § 5, ¶ 712, p. 338 (3d ed. 1957). Moreover, disclosure of a witness's name, address and employment has been made in camera when physical danger to the witness could have resulted from revelation of this vital information in open court. United States v. Palermo, 410 F.2d 468, 472 (7th Cir. 1969), rehearing and rehearing en banc denied, *id.*

We think that this case would present an equally convincing justification for limited in camera procedures if, in the course of the contempt trial, the district judge should find that Stamicarbon was likely to suffer irreparable injury, and that protection of its secrets could be achieved with minimal disruption of the criminal proceedings.[11] Stamicarbon asserts, and its estimate is undisputed, that the value of its trade secrets exceeds $1,000,000. It is, of course, impossible to establish a monetary value for the right to a public trial. We do not, however, think it irrelevant to our consideration that the Government here, at most, seeks only a fine against Cyanamid. The precarious balance between private claims and the constitutional right to a public trial may be struck more easily when the accused is not faced with loss of liberty.[12]

Even if the monetary loss likely to be suffered by a private party clearly outweighed the fine to be imposed upon a defendant, however, we would be unwilling without more to test the limits of a right whose observance the constitution commands. In this case, though, we find that the interests served by the right to a public trial could be secured to Cyanamid while still protecting Stamicarbon's secrets.[13] Perhaps the most frequently cited service rendered by the right of

11. The need for a sensitive accommodation of both interests involved in this case is emphasized by the fact that no fewer than 20 states during the last nine years have enacted statutes making appropriation or unauthorized disclosed of trade secrets a crime. Arkansas Stats. § 41–3949 et seq.; California Code Anno., Penal Code § 499c; Colo.Rev. Stats.1967, Perm.Supp., section 40–5–33 et seq.; Ga.Criminal Code § 26–1809; Smith-Hurd Illinois Anno.Stats., c. 38, § 15–1 et seq.; Burns Indiana Stats.Anno., Title 35, § 17–3–1 et seq.; 17 Me.Rev.Stats. Anno. § 2113 (1967). Mass.Laws Anno., c. 266, § 30; Mich. Comp.Laws Anno., § 752.771 et seq.; Minn. Stats.Anno., Title 40, § 609.52; Neb.Rev. Stats. § 28–548–01 et seq.; N.II.Rev.Stats. Anno., § 637:1 et seq.; N.J.Stats.Anno., 2A:- 119–5.3 et seq.; New Mex.Stats. 40A– 16–23; McKinney's Consol.Laws c. 46, N.Y. Laws Anno., Penal Law, §§ 155.00, 155.30, & 165.07; Ohio Rev.Code Anno., Title 13, § 1333.51 et seq.; Okla.Stats.Anno., Title 21, § 1732; Purdon Penna.Stats., Title 18, § 4899.2; Tenn.Code Anno. § 39–4238 et seq.; Wisc.Stats.Anno., Criminal Code, § 943.205. Prosecutions under these statutes will inevitably present similar clashes between defendants asserting their rights to public trial, and owners of trade secrets, whom the statutes were enacted to protect. Unyielding preservation of the public trial right would in such cases present trade secret owners with the Hobson's choice of suffering an unprosecuted theft of their secrets, or allowing a prosecuted thief to broadcast the same secrets at trial.

12. We emphasize that we do not here confront the situation where an individual faces imprisonment for his role in the corporate acts constituting contempt. *See* Hill v. United States ex rel. Weiner, 300 U.S. 105, 57 S.Ct. 347, 81 L.Ed. 537 (1937). There are no individual defendants in the underlying contempt ease.

13. It has been held that a criminal contempt action is not within those criminal prosecutions to which the sixth amendment right to a public trial applies. Levine v. United States, 362 U.S. 610, 616, 80 S.Ct. 1038, 4 L.Ed.2d 989 (1960), rev'd on other grounds, Harris v. United States, 382 U.S. 162, 86 S.Ct. 352, 15 L.Ed.2d 240 (1965). We decline to

public trial in the restraint on possible abuse of judicial power born of "[t]he knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion . . .." In re Oliver, 333 U.S. 257, 270, 68 S.Ct. 499, 506, 92 L.Ed. 682 (1948). But it would be possible in this case to permit the introduction of public light adequate to avert any possibility of infection in the proceedings. If the district court could not selectively exclude only those who had some interest in appropriating Stamicarbon's secrets—a possibility which we do not discount—Cyanamid could be permitted to have as many witnesses of its own choice attend as could be accommodated. Putting those attending under oath to keep confidential only the most precise details of ingredients and the compounding process, cf. Paul v. Sinnott, 217 F.Supp. 84 (W.D.Pa.1963), should occasion little chance of prejudice to Cyanamid. Moreover, it must be emphasized that only those portions of the trial which the district court should find likely to destroy the confidentiality of Stamicarbon's trade secrets would be subject to even this limited restriction. The likelihood

that a judge—who must on request make special findings of fact, F.R.Crim.P. 23 (c), in a trial where all testimony is recorded—will during those brief periods seize the opportunity to abuse his power is not great.[14]

Another frequently mentioned function served by a public trial is that it "may induce unknown witnesses to come forward with relevant testimony . . ." Estes v. Texas, 381 U.S. 532, 583, 85 S.Ct. 1628, 1653, 14 L.Ed.2d 543 (1965) (Warren, C. J., concurring). It would ordinarily be true *ex hypothesi* that even a group of spectators hand-picked by the defendant could not perform this service. *See, e. g.*, Tanksley v. United States, 145 F.2d 58, 10 Alaska 443 (1944). This, however, is not the ordinary case. The very subject matter of the litigation presumes that the number of persons having knowledge about Stamicarbon's melamine production process is small indeed. Those persons, moreover, are already under a contractual obligation not to disclose what they know. Of course we cannot overlook the possibility that engineers having expertise in the field, but no acquaintance with the specific compounds and

suggest the propriety of limited restrictions on public attendance at trial upon that ground, however, because of the procedural safeguards which have recently been extended to defendants in criminal contempt cases. The increase in constitutional protection has not been limited to those charged with contempt in open court, see, e. g., Codispoti v. Pennsylvania, 418 U.S. 506, 94 S.Ct. 2687, 41 L.Ed.2d 912 (1974); Mayberry v. Pennsylvania, 400 U.S. 455, 91 S.Ct. 499, 27 L.Ed. 2d 532 (1971); Johnson v. Mississippi, 403 U.S. 212, 91 S.Ct. 1778, 29 L.Ed.2d 423 (1971), but has been enlarged as well for contempts not committed in the presence of the judge. Bloom v. Illinois, 391 U.S. 194, 88 S.Ct. 1477, 20 L.Ed.2d 522 (1968). Moreover, the Court stated quite unequivocally in Mayberry v. Pennsylvania that "by reason of the Due Process Clause of the Fourteenth Amendment a defendant in criminal contempt proceedings [in a state court] should be given a public trial . . .." 400 U.S. at 466, 91 S.Ct. at 505. *See also* Bloom v. Illinois, *supra*, 391 U.S. at 205, 88 S.Ct. 1477. Finally, it is well understood

that the most useful function served by the right to a public trial is the prevention it offers against abuses of the judicial power. *See infra.* And what the Court said in *Bloom* regarding the constitutional right to a jury trial is equally appropriate with respect to the need for public airing:

[I]n contempt cases an even more compelling argument can be made [than in ordinary criminal trials] for providing . . . protection against the arbitrary exercise of official power . . .. Even when the contempt is not a direct insult to the court or the judge, it frequently represents a rejection of judicial authority, or an interference with the judicial process or with the duties of officers of the court. *Id.* at 202, 88 S.Ct. at 1482.

14. "This is not a case where it . . . could be charged that the judge deliberately enforced secrecy in order to be free of the safeguards of the public's scrutiny . . .." Levine v. United States, 362 U.S. 610, 619, 80 S.Ct. 1038, 1044, 4 L.Ed.2d 989 (1960).

methods which Stamicarbon seeks to guard, would be able to enlighten the court and perhaps aid in the ultimate determination the court must make. But Cyanamid, familiar as it is with the urea/ammonia process, could easily select as witnesses any number of experts with the desired qualifications.[15]

 We wish to emphasize the limited nature of the suggestion which we here make. To ignore the undeniable benefits rendered by the assistance of press and public at criminal proceedings would indicate an unawareness of history as well as legal precedent. In almost all cases the interests which would suffer from publicity will merit less attention than the very real concern that the accused might be prejudiced by restricted attendance. It is only under the most exceptional circumstances that limited portions of a criminal trial may be even partially closed. If the district court should after further consideration find such action appropriate in the underlying contempt case, it would only be because Stamicarbon had presented a compelling claim for relief, and the district judge had determined that the full benefit of a public trial could be secured to Cyanamid by limited restrictions on access.

Because of the more than two-month delay which this appeal has already occasioned in the criminal contempt action, we suggest that the district court proceed with the trial as expeditiously as possible.

Affirmed.

---

15. At least two other benefits to the defendant have been recognized to flow from the right to a public trial: "it arguably improves the quality of testimony, . . . [and] it may move all trial participants to perform their duties conscientiously." *Estes, supra,* 381 U.S. at 583, 85 S.Ct. at 1653. Once again, however, these functions could in this case be equally well performed by a group of Cyanamid's own choosing, or by the general public, exclusive of those whose attendance would result in the irreparable injury which Stamicarbon fears. It bears repetition, moreover, that only limited portions of the trial would be so restricted, and the

danger to the quality of testimony or the orderly conduct of the proceedings would be minimal.

There may also be, we recognize, a benefit which accrues to the public at large from the publicity of criminal proceedings. *See, e. g.,* In re Oliver, 333 U.S. 257, 270 n. 24, 68 S.Ct. 499, 92 L.Ed. 682 (1948) ; United States v. Consolidated Laundries Corp., 266 F.2d 941, 942 (2d Cir. 1959). But it must be acknowledged that the marginal benefit of increased public confidence which would accrue from unrestricted access in this case certainly does not counterbalance Stamicarbon's interest in secrecy.