ENCYCLOPEDIA BROWN PRODUC-
TIONS, LTD. and Howard David
Deutsch, Plaintiffs,

v.

HOME BOX OFFICE, INC., Defendant.

ENCYCLOPEDIA BROWN PRODUC-
TIONS, LTD. and Howard David
Deutsch, Plaintiffs,

v.

AMERICAN INTERNATIONAL CA-
BLEVISION INDUSTRIES, INC., Ca-
blevision Systems Corp., Comcast Corp.,
Cox Cable Communications, C–TEC Ca-
ble Systems, Simmons Communications,
Sutton Capital Associates, Inc., Tele–
Communications, Inc., Time Warner,
Inc., and Warner Cable Communica-
tions, Inc., Defendants.

Nos. 91 Civ. 4092(PKL),
93 Civ. 1407(PKL).

United States District Court,
S.D. New York.

Oct. 15, 1998.

Schlam Stone & Dolan, New York City (Richard H. Dolan, Jeffrey M. Eilender, of counsel), for Plaintiffs.

Patterson, Belknap, Webb & Tyler LLP, New York City (Kim J. Landsman, David G. Jacoby, of counsel), for Defendants.

### *OPINION AND ORDER*

LEISURE, District Judge.

Plaintiffs bring these consolidated actions alleging copyright infringement and various pendent state law claims against Home Box Office, Inc. ("HBO"), a cable television programmer, and various cable television system operators (the "cable operator defendants"). Pursuant to Rule 26(c) of the Federal Rules of Civil Procedure, defendants move to seal portions of the record and of the forthcoming trial. Plaintiffs oppose defendants' motion and cross-move to unseal this Court's Opin-

ion and Order dated August 24, 1994, as well as the briefs and documents submitted by the parties in connection therewith.

For the reasons stated herein, defendants' motion to seal is GRANTED in part and DENIED in part, and plaintiffs' cross-motion to unseal is GRANTED in part and DENIED in part.

## BACKGROUND

### I. Exhibition of the Pilot and Episodes

The Court presumes familiarity with the facts set forth in its Opinion and Order dated August 24, 1994, and its Opinion and Order dated September 24, 1998, issued in connection with this action. In brief summary of the relevant facts, EBP and HBO entered into an agreement, dated March 10, 1988 (the "Agreement"), granting HBO an option for production and licensing of an hour-long pilot television program (the "Pilot") based on Encyclopedia Brown, a character in a series of children's books.

Following HBO's exercise of the option for the Pilot, EBP produced, delivered and licensed the Pilot to HBO in exchange for payment of a fee. Under the Agreement, the Pilot could only be exhibited during a two-year period ending on March 3, 1991 (the "Exhibition Period").

The Pilot was provided by HBO to the cable operator defendants for viewing by cable subscribers. The relationship between HBO and the cable operator defendants is governed by Service Network Affiliation Agreements ("Affiliation Agreements"), which are negotiated separately by HBO with each cable operator. Declaration of Robert Grassi, dated June 20, 1997 [hereinafter "Grassi Decl."], at ¶ 4. Following expiration of the Exhibition Period, the Pilot was exhibited on the dates of May 2, 13, 22 and 26, 1991.

EBP also produced and delivered to HBO six additional episodes based on the Encyclopedia Brown character (the "Episodes"), in exchange for several payments. The last exhibition of the Episodes by HBO occurred on October 22, 1991. EBP has registered copyrights in the Pilot and the Episodes.

### II. Alleged Confidential Business Information

During discovery, HBO and the cable operator defendants disclosed certain business information which defendants contend is confidential. Most of the information is from 1991, the year the infringing broadcasts of the Pilot occurred. The information falls into four categories: (i) detailed operations information; (ii) HBO programming strategies and decisionmaking; (iii) customer surveys conducted by HBO; and (iv) license fees paid by HBO to plaintiffs. Defendants have submitted examples of documents containing alleged confidential information and have identified witnesses who are expected to provide live testimony regarding such information. The evidence proffered by defendants as to why the information should be sealed is summarized below.

#### A. *Operations Information*

Defendants proffer sworn declarations by representatives of HBO and the cable operator defendants that the following operations information should be sealed: breakdowns of defendants' revenues and expenses, the total number of HBO subscribers, the number of subscribers to HBO by geographic area, the rates charged by HBO to each cable operator, the discounts and other incentives given by HBO to cable operators and the amounts actually remitted by cable operators to HBO. Defendants' representatives testify that the information is kept confidential and, with respect to operations information contained in the Affiliation Agreements, employee access is limited. *See, e.g.,* Grassi Decl., ¶¶ 4, 9; Declaration of John M. Dyer [hereinafter "Dyer Decl."], dated June 19, 1997, ¶¶ 7–8. In addition, according to the declarations, the operations information defendants seek to seal contains far greater detail than the financial data required to be publicly disclosed by defendants. *See, e.g.,* Grassi Decl., ¶ 9; Dyer Decl., ¶ 8.

The cable operator defendant representatives testify that the cable operators would be irreparably harmed by disclosure of the actual rates paid by each cable operator to HBO for programming. *See, e.g.,* Dyer Decl.

¶¶ 5, 8. The representatives testify that public access to such information would give their competitors a bargaining advantage in negotiating with HBO and, in addition, would impede the cable operator defendants' ability effectively to bargain with suppliers of cable programming other than HBO. *Id.*, ¶¶ 5, 6.

The cable operator defendant representatives proffer further testimony that disclosure of detailed breakdowns of their revenues and expenses would allow competitors to ascertain each cable operator's cost and profit structure, threatening the companies' future profitability. Dyer Decl., ¶ 9. Finally, the cable operator defendant representatives testify that disclosure of the number of HBO subscribers of each cable operator may result in imposition of quotas on the cable operators by programming suppliers as a condition of favorable rates or other incentives. *Id.*, ¶ 11.

Robert Grassi, an HBO representative, testifies that disclosure of the rates charged and incentives offered to cable operators (or disclosure of information from which those rates could be obtained) would hinder HBO's ability to obtain favorable rates from cable operators and other service providers. Grassi Decl., ¶¶ 5–7. Moreover, Grassi states that disclosure of detailed HBO financial information would expose HBO's cost and profit structure and, thereby, threaten HBO's competitive position. *Id.*, ¶ 11.

Plaintiffs submit the declaration of an expert, Morton I. Hamburg, who contests the alleged confidentiality of the operations information. Hamburg testifies that the information is well-known due to frequent movement of employees between competitors in the cable programming industry and because the information is almost a decade old. Hamburg Decl., ¶ 10. Hamburg further states that the information can be easily extrapolated from publicly-available information. *Id.*, ¶ 12.

Plaintiffs also submit various public documents purporting to set forth the operations information defendants contend is confidential and/or which allegedly contain information from which the data can be extrapolated. Declaration of Jeffrey M. Eilender, dated October 5, 1997 [hereinafter "Eilender Decl."], *passim.*

## B. *Programming Strategies*

HBO submits testimony by Grassi that the confidential information includes HBO marketing strategies designed to aid cable operators in increasing subscribership to HBO. Grassi Decl., ¶ 8. Grassi testifies that disclosure of this information would allow HBO's competitors to appropriate HBO's strategies and/or otherwise to impede the effectiveness of those strategies. *Id.*

## C. *Customer Surveys*

HBO submits testimony by Harold Akselrad, another HBO representative, that the confidential information includes HBO surveys of customer viewing habits and preferences. Declaration of Harold Akselrad, dated June 20, 1997 [hereinafter "Akselrad Decl."], ¶ 4. Akselrad states that HBO spends significant amounts on such market research, and that disclosure of the research would unfairly benefit HBO's competitors. *Id.*

## D. *License Fees*

HBO proffers further testimony by Akselrad that the amounts HBO paid EBP to develop, produce and license the Pilot and Episodes are confidential. Akselrad Decl., ¶ 3. Akselrad states that disclosure of the payment amounts would adversely affect HBO's ability to negotiate favorable deals with programming producers. *Id.* In addition, Akselrad testifies that HBO's competitors would use such information against HBO in future bidding against HBO for programming. *Id.*

Plaintiffs contest defendants assertions in this regard by submitting the declaration of Deutsch, who testifies that numerous third parties know the amount paid by HBO for the Pilot. Declaration of Harold David Deutsch, dated October 5, 1997 [hereinafter "Deutsch Decl."], *passim.* In addition, plaintiffs proffer the testimony of Jeffrey M. Eilender, Esq., plaintiffs' attorney, that he has been informed by a third party of the amount of the Pilot fee. Eilender Decl., ¶ 20. Finally, plaintiffs proffer the expert opinion of Alan R. Morris that third parties frequently

know the license fees paid by HBO, either due to disclosure in publications or through disclosure by the numerous agents and attorneys representing financial backers of cable programming. Declaration of Alan B. Morris, dated October 10, 1997 [hereinafter "Morris Decl."], ¶¶ 13–15. Morris also testifies that fee arrangements as dated as those for the Pilot and Episodes are likely to be public knowledge. *Id.*, ¶ 16.

### III. Procedural Status

By Opinion and Order dated August 24, 1994, the Court granted plaintiffs' motion for summary judgment that HBO infringed the Pilot copyright by exhibiting the Pilot during May 1991. With respect to exhibition of the Episodes, the Court granted HBO's motion for summary judgment, finding that plaintiffs were equitably estopped from asserting HBO infringed the Episodes copyright and, in addition, that plaintiffs' conduct had the effect of creating a nonexclusive license for HBO to exhibit the Episodes.[1] The Court further declined to exercise supplemental jurisdiction over plaintiffs' pendant state law claims.

By various subsequent Stipulations and Orders entered following the Court's August 24, 1994, decision, the parties have consolidated the separate actions against HBO and the cable operator defendants and dismissed with prejudice from the consolidated action defendant American International Cablevision Industries, Inc. Moreover, pursuant to such Stipulations and Orders, the parties have (i) dismissed with prejudice, as to all defendants, Deutsch's claim for copyright infringement regarding the Pilot; and (ii) dismissed with prejudice, as to the cable operator defendants, plaintiffs' claim for copyright infringement regarding the Episodes.

By Opinion and Order dated September 24, 1998, the Court granted partial summary judgment in favor of defendants regarding (i) plaintiffs' claim for damages allegedly resulting from certain assertions by defendants in this litigation; and (ii) plaintiffs' claim that an agency relationship exists between the cable operator defendants and HBO, such that a finding of willful infringement by HBO

could be imputed to the cable operator defendants. The Court denied defendants' motion for summary judgment with respect to plaintiffs' claims for damages due to loss of sale to defendants of a reasonable license fee and due to loss of sales to third parties.

Remaining for resolution at trial is the determination of damages, if any, to plaintiffs resulting from HBO's infringement of the Pilot copyright and the determination of the cable operator defendants' liability, · if any.

The Court's previous decisions in connection with this matter, as well as the parties' submissions, have been filed under seal pending determination of whether a protective order should issue. Presently before the Court is defendants' motion to seal portions of the record and trial, and plaintiffs' motion to unseal this Court's August 24, 1994, Opinion and Order and related documents.

### DISCUSSION .

### I. Standard of Decision

Defendants move pursuant to Fed.R.Civ.P. 26(c) to seal portions of the record, and to exclude the public from portions of the forthcoming trial regarding plaintiffs' copyright infringement claim.

■ Accessibility of judicial documents and proceedings to the public is a centuries-old component of our legal system. *United States v. Amodeo*, 44 F.3d 141, 145 (2d Cir. 1995) [hereinafter "*Amodeo I*"]. Openness of judicial workings is, among other things, crucial to the citizenry's ability to "keep a watchful eye on the workings of public agencies", *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 598, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978), especially with respect to the judges of the Article III courts, who are not elected. Thus, while public access to court records and proceedings is not absolute, there has been a long-standing presumption in its favor and against sealing. *See id.*

The Court of Appeals for the Second Circuit has held that the decision whether to

---

**1.** As a result of this finding, HBO's counterclaim for unjust enrichment, asserted in the alternative

to its defenses to plaintiffs' infringement claim regarding the Episodes, was dismissed.

seal court records requires weighing the importance of the presumption of public access, depending upon the type of judicial function at issue, against the interests sought to be protected by sealing. *United States v. Amodeo*, 71 F.3d 1044, 1047–1051 (2d Cir.1995) [hereinafter *"Amodeo II"*]. The motives of the party invoking the presumption of public access, and those of the party opposing such access, may be considered insofar as they bear on the veracity of the parties' asserted positions. *Cf. id.* at 1050.[2] In all events, "a judge must carefully and skeptically review sealing requests to insure that there really is an extraordinary circumstance or compelling need." *In re Orion Pictures Corp.*, 21 F.3d 24, 27 (2d Cir.1994).

■ Similar analysis governs a request to seal portions of a civil trial. The Court must be certain to give due consideration to the importance of public trial—a proceeding at the core of the functions of the Article III courts—and to the additional burden on the court and disruption of orderly conduct of trial created by sealing. *See Stamicarbon, N.V. v. American Cyanamid Co.*, 506 F.2d 532, 540–41 (2d Cir.1974); *Standard & Poor's Corp., Inc. v. Commodity Exch. Inc.*, 541 F.Supp. 1273, 1276–78 (S.D.N.Y.1982).

## II. Previous Protective Orders

■ Before proceeding to apply the legal standard set out above to the facts of this case, the Court must briefly address plaintiffs' contention that a stipulated protective order entered into by the parties during pretrial discovery justifies sealing of the materials at issue. Defendants' contention is clearly wrong. The stipulated protective order, as modified, expressly states that plaintiffs agreed to maintain the confidentiality of the information prior to trial

> without prejudice to plaintiffs' contention that 'good cause' within the meaning of Rule 26(c) has not been demonstrated by HBO, and may not exist, to justify the

entry of any protective order in this litigation.

Stipulation and Protective Order, dated November 27, 1991, at 1. The Stipulation and Order further provides that in the event of a dispute over whether material deemed confidential during discovery should also be sealed at trial, the dispute is to be determined by the Court

> as if this stipulation and order had never been signed. Any party seeking confidential treatment of any evidence offered at trial will bear the burden of proof and the burden of persuasion. . . .

*Id.* at 9.

Thus, according to the plain language of the stipulated protective order, it does not mandate sealing of the materials during trial. *See Department of Econ. Dev. v. Arthur Andersen & Co.*, 924 F.Supp. 449, 486–87 (S.D.N.Y.1996) (discussing analogous confidentiality agreement). Therefore, the Court finds that the stipulated protective order is irrelevant to the issues presently before the Court, except to the extent it evidences an effort on the part of defendants to maintain the confidentiality of the information at issue.

## III. Application of the Standard

### A. *Presumption of Access*

■ Defendants seek to seal decisions issued by this Court, briefs and documents submitted to the Court in relation thereto, documents expected to be offered as evidence at trial, trial testimony and the Joint Pretrial Order. With the exception of the Joint Pretrial Order, the material requested to be sealed either directly affects adjudication of this action or, in the case of the Court's decisions, is an actual adjudication. Consequently, there is a strong presumption of public access to the materials.

### 1. *Court Decisions and Related Submissions*

■ The Court has previously issued two decisions in connection with this matter:

---

**2.** Each party in the instant case has spilled much ink concerning the alleged motivations of its opponent. The Court finds that both sides have legitimate legal bases for their positions. Thus, mindful of the Second Circuit's admonition that

motives are not to become the focal point of the assessment of a motion to seal, *see Amodeo II*, 71 F.3d at 1050, the Court does not address the parties' *ad hominem* attacks on one another in any detail.

an August 24, 1994, Opinion and Order granting, among other things, summary judgment in favor of plaintiffs on their copyright infringement claim, and a September 24, 1998, Opinion and Order granting partial summary judgment in favor of defendants as to several issues. There is a particularly strong presumption of public access to such decisions as well as to the briefs and documents submitted in relation thereto. The Court's decisions are adjudications—direct exercises of judicial power the reasoning and substantive effect of which the public has an important interest in scrutinizing. *See Joy v. North,* 692 F.2d 880, 893 (2d Cir.1982), *cert. denied sub nom.,* 460 U.S. 1051, 103 S.Ct. 1498, 75 L.Ed.2d 930 (1983); *Scheiner v. Wallace,* No. 93 Civ. 0062, 1996 WL 633226, at *1 (S.D.N.Y. Oct. 31, 1996) ("Nothing could more 'directly affect' the adjudication than the Opinion itself."). Similarly, the parties' submissions, which the Court considered and relied upon in reaching its decisions, "directly affect [the] adjudication", *Amodeo II,* 71 F.3d at 1049, and, thus, also carry a strong presumption of public availability. *See Joy,* 692 F.2d at 893 ("documents used by parties moving for, or opposing, summary judgment should not remain under seal absent the most compelling reasons."); *see also Department of Econ. Dev.,* 924 F.Supp. at 487–88; *Gottlieb v. County of Orange,* 151 F.R.D. 258, 260 (S.D.N.Y.1993).

#### 2. *Trial Exhibits and Testimony*

■ Documentary exhibits and trial testimony are also strongly presumed to be public, since they are a direct part of the process of adjudication. *See Amodeo II,* 71 F.3d at 1049 ("the public has an 'especially strong' right of access to evidence introduced in trials."). Defendants nonetheless argue that the strength of the presumption attaching to such material is ameliorated by the fact that the material relates only to determination of damages, not liability. The Court disagrees. Determination of the amount of damages, if any, is on par with the task of assessing liability. Indeed, in many cases, the issue of damages will be of greater concern to the public and the parties than the issue of liability. As such, documents and testimony concerning determination of damages carry with them the same strong presumption of openness as those concerning strictly the issue of liability.

#### 3. *Joint Pretrial Order*

■ With regard to the Joint Pretrial Order, the Court finds that the presumption of public access to be of lesser weight. While the Order is, as its name suggests, approved by the Court, it does not constitute a substantive adjudication. In addition, although the Order may contain stipulated facts and/or other admissions by the parties that may ultimately affect the outcome, one of the principal functions of the Order is simply organizational in nature. Thus, the strength of the presumption favoring disclosure of the Pretrial Order falls somewhere in the middle of the "continuum from matters that directly affect an adjudication to matters that come within a court's purview solely to insure their irrelevance." *Amodeo II,* 71 F.3d at 1049.

### B. *Balancing of Countervailing Interest in Sealing*

"Once the weight of the presumption is determined, a court must balance competing considerations against it." *Amodeo II,* 71 F.3d at 1050. In the instant case, defendants assert the material they seek to seal contains trade secrets the disclosure of which would irreparably harm defendants' competitive position. Plaintiffs respond that the information is not secret and that, in any case, defendants would not be harmed by its release. The Court finds that, with one exception discussed below, defendants have presented persuasive evidence that the material sought to be sealed is confidential and that the harm to defendants' competitive position that would result from disclosure outweighs the interest in public access.

■ Potential damage from release of trade secrets is a legitimate basis for sealing documents and restricting public access during trial. *See Nixon,* 435 U.S. at 598, 98 S.Ct. 1306 (documents); *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 600 n. 5, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980) (Stewart, J., concurring) (trial); *Stamicarbon,* 506 F.2d at 539–541 (trial); *Standard & Poor's,*

541 F.Supp. at 1276–78 (trial); *see also Amodeo I*, 44 F.3d at 147; *Bergen Brunswig Corp. v. Ivax Corp.*, No. 97 Civ.2003, 1998 WL 113976, at *3 (S.D.N.Y. March 12, 1998); *In re NASDAQ Market-Makers Antitrust Litig.*, 164 F.R.D. 346, 355 (S.D.N.Y.1996). A party seeking to preclude disclosure of trade secrets has the burden to show that the information in fact constitutes a trade secret, that disclosure would harm movant's competitive position and that the asserted harm outweighs the presumption of public access. With respect to proof of competitive harm, vague and conclusory allegations will not suffice. *Department of Econ. Dev.*, 924 F.Supp. at 487. Movant must prove that disclosure would " 'work a clearly defined and very serious injury.' " *Turick v. Yamaha Motor Corp.*, 121 F.R.D. 32, 35 (S.D.N.Y.1988) (quoting *United States v. IBM*, 67 F.R.D. 40, 46 (S.D.N.Y.1975)).

### 1. *Status as Trade Secrets*

■ Under Section 757 of the Restatement of Torts, relied upon by New York courts and courts in this Circuit, a trade secret is "any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." *Softel v. Dragon Med. & Scientific Communications*, 118 F.3d 955, 968 (2d Cir.1997) (quoting Restatement of Torts cmt. b at 5 (1939)), *cert. denied*, —— U.S. ——, 118 S.Ct. 1300, 140 L.Ed.2d 466 (1998). As is evident, the principal considerations are whether the information is confidential and whether it is commercially valuable to the holder.

■ Defendants submit numerous affidavits attesting to the confidentiality of the information they seek to seal. Plaintiffs challenge the confidentiality of only two of the categories of information with evidence— the operations information and the licensing fees HBO paid to EBP. With respect to the operations information, plaintiffs submit documents purporting to show that the information is public or, at a minimum, that it can be

readily ascertained based on public documents. Having reviewed these documents, the Court finds that the documents do not in fact contain the detailed financial information defendants allege is confidential, nor can the confidential information be extrapolated from the documents submitted by plaintiffs.

Plaintiffs also submit the declaration of Hamburg that the operations information is generally well-known in the industry and easy to obtain. However, the declaration speaks only in generalities. Hamburg does not testify that the specific operations information defendants seek to protect has in fact been publicly disclosed or could be easily obtained. Hamburg's testimony is, therefore, unconvincing.

■ With respect to the license fees HBO paid to EBP, plaintiffs proffer the declarations of Morris, Deutsch and Eilender that the fee amounts are public knowledge. The Court finds that Morris's testimony is too vague to be credited as evidence of the public availability of the specific fees paid by HBO to EBP. The Court also does not credit the testimony of Eilender, whose assertion that the fee for the Pilot is not confidential appears to be premised on a misunderstanding. *Compare* Eilender Decl., ¶ 20 *with* Declaration of Trisha Gum, dated January 7, 1998, ¶¶ 2–5.

Deutsch's testimony, in contrast, identifies specific instances in which the amount of the fee paid by HBO to EBP for the Pilot was recited to Deutsch by third parties.[3] Having considered defendants' criticisms of Deutsch's testimony and the fact that one of the examples cited by Deutsch appears to be premised on the same misconception as that held by Eilender, the Court credits Deutsch's testimony that the license fee HBO paid for the Pilot has been publicly disclosed.

Thus, the Court finds that, with the exception of the fee HBO paid EBP for the Pilot, the information defendants seek to seal is confidential. In addition, the Court finds that given, among other things, the extent of the confidentiality and, as addressed below,

---

**3.** Deutsch's testimony appears not to address public knowledge of the fee HBO paid EBP for the Episodes. The Court credits the testimony by

Akselrad, an HBO representative, that the amount of the Episode fee is confidential.

the importance of the information to defendants, the information defendants seek to seal comprises of trade secrets.

### 2. *Harm to Defendants from Disclosure*

The declarations proffered by defendants explain in detail the extensive and irreparable harm to defendants that would result from disclosure of the confidential information, which harm the Court has described previously in this Opinion. It suffices here to note that defendants' competitive position would be affected at most, if not all, economic levels, vis-a-vis their direct and indirect competitors, upstream suppliers and downstream customers.

■ Plaintiffs most significant challenge to the evidence of harm of disclosure is their contention that the information is stale, since most of it is from 1991. The Court does not find plaintiffs' argument persuasive. Confidential business information dating back even a decade or more may provide valuable insights into a company's current business practices that a competitor would seek to exploit. In the instant case, defendants have provided specific testimony that, for example, the cost and profit structures of the defendants, the volume of subscribership and the strategies employed by HBO have not significantly changed since 1991. Grassi Decl., ¶ 11; Reply Declaration of Robert Grassi, dated January 8, 1998 [hereinafter "Grassi Reply Decl."], ¶ 3; Dyer Decl., ¶¶ 9, 11. Defendants have proffered further testimony that most of the Affiliation Agreements they seek to seal, which contain a variety of types of confidential information, are still in force. Grassi Reply Decl., ¶ 3.

The only exception in this respect is the license fees paid by HBO to EBP. Defendants do not contend that the fees paid for the Episodes are of a different character than those paid for the Pilot. Therefore, having found that the fee paid for the Pilot is not confidential, the Court further finds that there can be no irreparable harm to defendants from disclosure of the fees paid by HBO for the Episodes. Accordingly, the Court finds that defendants have failed to establish that sealing of the Episodes fees outweighs the public interest in their disclosure.

In sum, the Court finds that defendants would suffer irreparable harm from disclosure of the confidential information, with the exception of the license fees paid by HBO. The Court further finds that the harm from disclosure of such information outweighs the public's interest in access to it and, thus, the information should be sealed.

## IV. Remedies

Although the Court has found that most of the information identified by defendants merits protection, the Court is cognizant of its duty to narrowly tailor the relief afforded to defendants "with a view towards the presumption of access to judicial records". *DiRussa v. Dean Witter Reynolds Inc.*, 121 F.3d 818, 827 (2d Cir.1997).

■ Sweeping protection of the documents containing defendants' confidential information should be avoided. Thus, the most appropriate remedy is for the "district court, after weighing competing interests, to edit and redact a judicial document in order to allow access to appropriate portions of the document." *Amodeo I*, 44 F.3d at 147. With respect to the Court's decisions in this matter, comprised of the August 24, 1994, Opinion and Order, the September 24, 1998, Opinion and Order, and this Opinion and Order, the Court finds that the only allegedly protected information contained therein consists of the amount paid by HBO to EBP for the Pilot and Episodes. Because the Court has found that those fees are not entitled to protection, the Clerk of the Court shall be directed to place the decisions in the public record without alteration.

As to the remaining documentary evidence, including the Pretrial Order, other submissions by the parties to the Court and documents sought to be used at trial, defendants are directed to consult with opposing counsel prior to the pre-trial conference scheduled for November 20, 1998, regarding appropriate redactions. Both parties shall be prepared to discuss proposed redactions at the conference.

Complete closure of the forthcoming trial would also likely constitute an overly broad

remedy. Any one of a variety of less restrictive alternatives may be appropriate, including, for example, closure only during the testimony of certain witnesses, selective exclusion of persons who may have an interest in appropriating the information or, possibly, having those in attendance take an oath to maintain the confidentiality of the information. *See, e.g., Stamicarbon,* 506 F.2d at 541. The parties are directed to discuss these and other possible alternatives prior to the November 20, 1998, pre-trial conference, and to be prepared to propose specific alternatives to complete closure at the conference. In the course of discussions, the parties should consider the implications of plaintiffs' election of a jury trial.

## CONCLUSION

For the reasons set forth above, defendants' motion to seal portions of the record is hereby GRANTED in part and DENIED in part, and plaintiffs' cross-motion to unseal this Court's August 24, 1994, Opinion and Order and related documents is hereby GRANTED in part and DENIED in part to the extent the related documents contain protected material. The Clerk of the Court is directed to unseal the Court's Opinion and Order dated August 24, 1994, and the Court's Opinion and Order dated September 24, 1998.

**SO ORDERED.**