**In the Matter of LAW RESEARCH SERVICE, INC., Appellant,**

v.

**John Herbert CROOK, Appellee.**

**No. 435, Docket 74–2073.**

United States Court of Appeals, Second Circuit.

Argued March 7, 1975.

Decided July 21, 1975.

Ellias C. Hoppenfeld, New York City (Krause, Hirsch & Gross, New York City, of counsel), for appellant.

Richard L. Aronstein, New York City, for appellee.

Before FRIENDLY and GURFEIN, Circuit Judges, and BARTELS,* District Judge.

FRIENDLY, Circuit Judge:

This appeal arises as a consequence of the financial embarrassment of Law Research Service, Inc. (LRS), which has generated a considerable volume of litigation.[1] LRS, for a time debtor in possession in a Chapter XI arrangement proceeding, is appealing from an order of Judge Motley in the District Court for the Southern District of New York, affirming an order of Bankruptcy Judge Asa S. Herzog which, over the objection of LRS, allowed the claim of John Herbert Crook for $25,923.65, plus interest at 8 per cent since November 28, 1969, as a secured claim and refused to rule that such allowance would preclude Crook from pursuing a related claim against the reorganized company, and also denied LRS' motion for reargument. The most serious problem is a jurisdictional point advanced by LRS on appeal for the first time. Because of the inadequacy of the portions of the record of the bankruptcy court that were transmitted to us to enable us to pass upon this and the equally inadequate briefing, we have been obliged to engage in more than the

---

* Of the District Court for the Eastern District of New York, sitting by designation.

1. See, e. g., *Law Research Service, Inc. v. Martin Lutz Appellate Printers, Inc.*, 498 F.2d 836 (2 Cir. 1974); *Law Research Service, Inc. v. General Automation, Inc.*, 494 F.2d 202 (2 Cir. 1974); *Law Research Service, Inc. v. Hemba*, 384 F.Supp. 729 (S.D.N.Y.1974); *Law Research Services, Inc., Claim of Bengert*, 386 F.Supp. 749 (S.D.N.Y.1974); *Law Research Service, Inc. v. United States Fidelity & Guaranty Co.*, No. 71 B 598 (S.D.N.Y., Feb. 21, 1975).

ordinary amount of research both to dig out the facts and to determine the applicable rule of law.

## I. *The Facts and the Proceedings Below*

LRS is a New York corporation which offered computerized legal research services to attorneys. Certain legal materials, notably court decisions, were to be stored in a computer owned and operated by Western Union in New York and be retrieved by inquiries through teletype machines over Western Union communication facilities. LRS' services were to be offered throughout the nation by means of a network of franchises. Claimant Crook signed a franchise agreement on March 29, 1966, which entitled him to act as "Director" with exclusive rights to promote the service in the areas surrounding Austin and San Antonio and to share in the profits arising from his sales efforts. He paid a total of $15,500 for the franchise. LRS promised to use its best efforts to develop and make available its computer library within six months of the date of the agreement.

When a dispute arose between LRS and Western Union concerning the use of Western Union facilities and LRS was unable to meet its obligations to Crook, he filed suit in a Texas court against LRS, Ellias C. Hoppenfeld, its majority stockholder and president, and one Thatcher, whose fraudulent misrepresentations allegedly induced Crook to purchase the franchise. Making a variety of contract and tort claims,[2] Crook sought some $94,900 for damages suffered during the period June 1, 1966, through May 31, 1967, when he ceased incurring expenses.[3]

Meanwhile LRS had commenced an action for breach of contract in the Supreme Court of New York, New York County, against Western Union, which had withdrawn use of the computer and thereby rendered LRS unable to meet its service obligations to its franchisees. The Supreme Court found in favor of LRS on May 27, 1968, *Law Research Service, Inc. v. Western Union Telegraph Co.*, No. 20092 (Sup.Ct., N.Y.Co.), on the issue of liability, and appointed a special referee to determine the damages sustained. Six months later, on November 28, 1969, Crook and LRS signed the agreement and assignment which gave rise to this appeal.

The agreement noted that Crook had commenced his Texas court action against defendants and that "defendants are desirous of adjourning the trial of the said suit until May 31, 1970, and making certain other provisions in regard thereto" and provided that LRS agreed to execute an assignment, in the amount of $25,923.65, with interest of 8 per cent from the date of the agreement until the date of payment, of its claim against Western Union and any sums recovered in connection with that claim.[4] In return, Crook agreed to adjourn the Texas trial "to May 31, 1970, at which time, if the aforesaid assignment has not been paid in full, the plaintiff may proceed to trial . . . [in Texas] as if this Agreement had not been executed." The assignment was to be "without prejudice to the rights of the parties in the suit now pending" in Texas. If the assignment was not paid in full by the specified deadline, the trial would pro-

---

**2.** Among other things, Crook claimed he was told that the system was already operational in New York, that it involved a new information retrieval system, and that LRS was a successful, ongoing enterprise—all of which statements were alleged to be untrue.

**3.** This was computed as follows: $15,500 paid for the franchise, $16,900 for costs incurred in promoting the franchise, $12,500 for lost income as a consequence of Crook's devoting time to the franchise rather than pursuing his

livelihood as an attorney, and $50,000 for exemplary damages.

**4.** This figure was the sum of $15,500 paid for the franchise and $10,423.65 "expended by the Plaintiff in reliance upon the franchise agreement." This represented a reduction of $6,476.35 of the claim for incurred expenses and omission of the claim for lost livelihood and exemplary damages, see note 3 *supra*.

ceed at Crook's instance without either party being able to assert the assignment or agreement from which it arises as an admission by the other. On the other hand, "[u]pon full satisfaction and payment of the said assignment before May 31, 1970," Crook was to discontinue the Texas action and return the franchise papers and other materials and both sides were to execute general releases. The defendants in the Texas action warranted, *inter alia*, that the claim of LRS against Western Union had not been assigned or encumbered in excess of $200,000, aside from attorneys' fees.

The assignment accorded with the agreement. LRS assigned to Crook "the interest of the Assignor in said claim to the extent and amount of $25,923.65" plus interest as above and "irrevocably appoints the Assignee its attorney . . . to use all lawful means for the recovery of the amount of $25,923.65 with interest thereon . . . and upon payment to acknowledge satisfaction or to discharge such judgment to the extent of said sum of $25,923.65 with interest . . . ." The assignment itself did not mention any deadline for payment.

This assignment was served upon Western Union and was filed with the New York County Clerk's Office on June 22, 1970. On the following day, the New York Supreme Court entered a judgment against Western Union in the sum of $1,064,551.61. This judgment, however, was appealed.

LRS failed to make payment or satisfaction on the assignment to Crook before the deadline date of May 31, 1970, because, we are told, "Law Research did not receive the proceeds of its claim

against Western Union until some time in 1972." However, it claims that in October or early November of 1970 Hoppenfeld offered to pay Crook the full amount of the assignment, including interest, but that Crook refused to accept payment and execute a general release as the agreement allegedly required. LRS therefore commenced an action against Crook for specific performance in December 1970 in the New York Supreme Court, which it says is still pending.

In the meantime, however, Crook continued to pursue his action in Texas. The Texas court declined to permit a special appearance by the defendants and a jury found for Crook on July 17, 1970. *Crook v. Law Research Service, Inc.*, No. 161,798 (53d Dist., Travis Co., Texas). On defendant Hoppenfeld's motion, however, the court set aside the verdict in September 1970, after which there ensued, according to the Texas court that ultimately heard an appeal on the second trial there, "a great deal of legal skirmishing between the parties." *Hoppenfeld v. Crook*, No. 12,058 (Ct.Civ. App., 3d Dist., July 18, 1973), mem. op. at 3.[5]

On June 18, 1971, LRS filed a petition for an arrangement under Chapter XI of the Bankruptcy Act in the District Court for the Southern District of New York. Crook soon thereafter filed an application to preserve the claim asserted in Texas against discharge, Bankruptcy Act § 17c(2), on the ground that it was based upon a liability for obtaining money or property by false pretenses or false representations. Bankruptcy Act § 17a(2). He asked for a determination of nondis-

---

**5.** In order to comply with Bankruptcy Judge Babitt's order enjoining the prosecution of any actions against LRS upon its filing a petition for an arrangement under Chapter XI, Crook obtained an order from the Texas court, dated October 2, 1972, severing LRS as a defendant, and prosecuted his action against the remaining defendants, Hoppenfeld and Thatcher. He was ultimately awarded a recovery in a non-jury trial of (1) $27,632.37 against the remaining defendants jointly for actual damages and lost earnings, (2) an additional $28,000 against

Hoppenfeld for exemplary damages, and (3) an additional $15,500 against Thatcher for exemplary damages and for payment of the last installment on the franchise agreement. To top this off, the Texas trial court determined that the non-appearing defendants could not credit the amount of the assignment against the recovery. *Crook v. Hoppenfeld*, No. 161,-798–A (53d Dist., Travis Co., Tx., Nov. 27, 1972). The Texas Court of Civil Appeals, however, reversed this decision for want of *in personam* jurisdiction.

chargeability and a trial "of all the issues in this proceeding" for actual damages of $44,490.66 and exemplary damages of at least $50,000. On December 9, 1971, Bankruptcy Judge Herzog held that Crook was entitled to a jury trial, Bankruptcy Act § 17c(5), on the issues of liability and dischargeability, Bankruptcy Act § 17c(3). His opinion was concerned primarily with the question of jury trial;[6] apparently LRS did not then raise the point that Crook could not pursue his larger claim if he sought to realize on the assignment.

Pursuant to § 324 of the Bankruptcy Act, LRS included with its petition for an arrangement a list of its creditors. Crook was named as a creditor, but his status (secured or unsecured) was not noted, nor was the amount of indebtedness. Crook was also included in a list of franchisees who had sued LRS prior to the petition. This list stated that Crook sought $144,000 in the Texas court. In its formal Schedule of Creditors filed August 31, 1971, LRS named Crook as an unsecured creditor who held a "Franchisee Contingent Claim," liability as to which LRS disputed, in the sum of $15,500, the amount paid by him under the franchise contract.

While LRS' New York judgment against Western Union was on appeal, the parties compromised the judgment in the sum of $1,440,000 in a settlement agreement of considerable complexity. The agreement, dated December 29, 1971, recited that the parties believed it to be "in the best interests of the debtor's estate" and that it would "enable the rehabilitation of the debtor in accordance with the purposes and policies of Chapter XI of the Bankruptcy Act," and it prescribed in detail the provisions

of the arrangement which LRS was to submit for approval. Specifically, it stated that the arrangement was to provide for the following: (a) the payment in full of administrative expenses; (b) the payment in full of priority claims; (c) "the payment of the claims of secured creditors in accordance with existing agreements or such terms as may be agreed upon between LRS and the secured creditor"; (d) the classification of unsecured creditors claiming on the basis of franchises acquired, directly or indirectly, from LRS in a separate class denominated "Franchise Creditors," whose filed and allowed claims were not to exceed the sum of $420,000 in cash; (e) the classification of all other unsecured creditors as "Unsecured Trade Creditors" and the settlement of their claims, filed and allowed, in a sum not to exceed $165,000 in cash; (f) upon confirmation of the arrangement, the release of Western Union and those associated with it from all claims arising out of the agreement between Western Union and LRS. In return, "[f]or purposes of enabling LRS to propose and effectuate an Arrangement under Chapter XI of the Bankruptcy Act," Western Union agreed to pay LRS or such others as the bankruptcy court may direct a "Compromise Sum" of $1,440,000 in complete settlement of all claims against it as "contemplated by the Arrangement and as asserted, claimed or possessed by LRS, Computer Searching Service Corp. [a subsidiary of LRS], or Ellias C. Hoppenfeld." General releases and a stipulation discontinuing LRS' action in the New York Supreme Court against Western Union were to be executed and held in escrow until an order confirming the arrangement became final. The settlement further provided for the purchase

---

**6.** We express no opinion on the propriety of the order insofar as it granted a jury trial on both of these questions. For the view that the question of dischargeability is not one for the jury even if the underlying issues of liability and dischargeability are the same, see *In re Swope*, 466 F.2d 936 (7 Cir. 1972) (per curiam), *cert. denied*, 409 U.S. 1114, 93 S.Ct. 929, 34 L.Ed.2d 697 (1973); *In re Palfy*, 336 F.Supp.

1268 (N.D.Ohio 1972); *In re Hinchey*, 349 F.Supp. 116 (D.Or.1972); Countryman, *The Dischargeability Law*, 54 Am.Bankruptcy L.J. 1, 35, 36 (1971). Contrast 1A Collier, Bankruptcy ¶ 17.28A[6] (14th ed. 1974), of which Bankruptcy Judge Herzog was one of the revision editors, acknowledging these authorities but developing a contrary argument similar to that in the judge's opinion here.

by Western Union from LRS of a non-interest bearing note for $350,000 to be paid by LRS' providing certain computerized legal research services to Western Union over a period of seven years.

This settlement agreement was supplemented by a letter of April 11, 1972, which, *inter alia*, dealt in greater detail with the claims of the secured creditors of LRS. It provided, in relevant part, that LRS:

> [W]ill consent to appropriate procedures so that sufficient funds will be set aside to enable the satisfaction of claims of allegedly secured creditors to the extent that their claims may be allowed and fixed, which funds will be subject to the jurisdiction of the Bankruptcy Court and all vouchers relative thereto shall require the counter-signature of the Referee in Bankruptcy. Concurrently with the making available to Law Research Service, Inc. of the sum of $685,000, a part of the compromise sum under the aforesaid Agreement, for the making of a depos-

it, under court order, with a disbursing agent appointed by the Bankruptcy Court, the Western Union Telegraph Company will also make the following deposits:

> (a) the sum of $755,000 to be used for the satisfaction of claims of allegedly secured creditors in an account maintained with a designated depository in the name of Law Research Service, Inc., subject to the jurisdiction of the Bankruptcy Court and all withdrawals therefrom shall be made only upon vouchers bearing the countersignature of the Referee in Bankruptcy.[7]

There were several conditions precedent to the effectiveness of the settlement agreement. The first was a final order of the bankruptcy court approving the terms of the agreement. After giving notice to creditors of the general terms of the agreement, Bankruptcy Judge Herzog approved the settlement during a hearing on April 11, 1972, and signed an order to that effect on April 24.[8] A second condition precedent was

---

**7.** We are not altogether clear as to the derivation of the $685,000 figure. Apparently the reference is to the maximum sums available for the two specified categories of unsecured creditors, but the combination of these yields a total of $585,000. Perhaps the excess $100,000 was for priority claims, administration expenses, or both. In any event the $685,000 and the $755,000 are the aggregate of the $1,440,000 which Western Union paid in settlement of the judgment.

**8.** Another puzzlement about the figures is this: While the settlement agreement as supplemented speaks of a fund of $755,000 for the benefit of secured creditors of LRS, subsequent documents refer to a figure of $455,000. The reduction appears to represent a $300,000 shift from the $755,000 fund for secured creditors to the $685,000 fund established for the unsecured creditors, see note 7 *supra*, which was under the disbursing agent's custodial control. Thus, an order of Bankruptcy Judge Herzog dated June 8, 1972, mentions "the sum of $985,000 for the purpose of enabling the deposit required under Chapter XI of the Bankruptcy Act and under the arrangement proposed by the debtor herein . . . deposited in an account of *Law Research Service, Inc.*, debtor, Sheldon Lowe, as disbursing agent, in a designated depository Company,

and the sum of $455,000 for the satisfaction of claims of secured creditors." Apparently, during the interim between the April 11 letter which supplemented the settlement agreement between LRS and Western Union and the June 8 order, LRS convinced Western Union that the larger figure of $755,000 did not have to be maintained in the account for secured creditors. Indeed, this is the thrust of a letter from counsel for Western Union at the request of counsel for LRS to James Barr, Administrative Assistant to the Bankruptcy Court, dated June 16, 1972, informing Mr. Barr of status of the deposit in the account for secured creditors "pursuant to the Settlement Agreement." The letter recited that a deposit of $455,000 had been effected, "that more than sufficient moneys have been deposited in the distributor's [disbursing agent's] account [for unsecured creditors] and that there will be an excess in that account after the payment of all claims which should be utilized to cover any short-fall in the secured creditors' account." The letter continued that counsel understood that sufficient funds should be maintained to satisfy the claims of certain secured creditors, which it then listed, in the amount of $534,940.11. One of these creditors was Crook in the amount of $25,923.65. The letter acknowledged that the amount in the fund for secured creditors could not cover the listed claims plus interest but

that the arrangement proposed by LRS be accepted by both classes of unsecured creditors and confirmed by final order of the bankruptcy court.

The plan of arrangement filed by LRS on January 21, 1972, complied in most respects with the terms set out in the settlement agreement. It provided that "Class A" or "Franchise" unsecured creditors were to be paid in cash upon confirmation not less than 30% of their claims without interest. A sum of not less than $420,000 was to be deposited by Western Union with the court-appointed distributor for "franchise creditors whose claims have been filed and allowed." These creditors were to receive a maximum compensation of 35% of their claims, the addition over the minimum figure of 30% to be made up in cash, if any be left from the fund of $420,000, otherwise in common stock of the debtor. The remaining unsecured (Class B) creditors were to be paid on similar terms out of a fund of $165,000 with a minimum cash payment of 25% and a maximum cash and stock payment of 30% of filed and allowed claims. Consistently with the generally recognized principle that an arrangement under Chapter XI cannot affect the claims of secured creditors, see Bankruptcy Act § 306(1); 9 Collier, Bankruptcy ¶ 8.01[3], at 155 (14th ed. 1972), LRS proposed its plan only for "its unsecured creditors"; no mention was made of secured creditors or of the separate fund provided for them by the settlement agreement. The plan did not provide for the retention of jurisdiction by the bankruptcy court. See §§ 357(7) and 368.

After notice to the creditors of the plan pursuant to § 335 of the Bankruptcy Act, Bankruptcy Judge Herzog found in an order of April 21, 1972, that a majority in number and amount of both classes of unsecured creditors accepted the plan. His order of confirmation was thereafter filed on June 20. The order recited that a total of $1,060,000 [9] and 31,000 shares of LRS stock had been deposited with Sheldon Lowe, the distributing agent, and ordered that the money and other consideration be distributed in accordance with an order of distribution to be thereafter entered. The order of confirmation also retained jurisdiction for the court "of this proceeding and of all pending matters therein," including in particular "over any and all contingent, and disputed claims" and "with respect to all monies deposited with Sheldon Lowe as disbursing agent." [10] Finally, Bankruptcy Judge Herzog directed LRS to file a list of creditors whose claims had been scheduled but not filed so that the court could give those creditors notice, pursuant to § 355(1), that they may file claims within thirty days of mailing of notice of confirmation but that such claims may not be allowed "for an amount in excess of that set forth in the debtor's schedules." LRS provided such a list, which included Crook as a "Franchise Creditor" in the amount of $15,500, and the court sent the requisite notice. On July 18, within the thirty-day period, Crook filed Claim No. 502 as a "secured Creditor" in the amount of $25,923.65 plus interest based upon the assignment received in connection with the Texas action.[11] He filed no claim as an unsecured franchise creditor, evident-

---

reiterated that surplus moneys would be available from the disbursing agent's account to cover any deficiency.

9. This was the sum deemed necessary to obtain acceptance and confirmation of the plan and is comprised of the total of $985,000, previously deemed necessary for the deposit by debtor under § 337(2), see note 8 *supra*, and an additional $75,000 from the $350,000 loan from Western Union.

10. No mention was made of secured claims, nor of the separate fund for them from which, according to the terms of the Western Union

settlement agreement, moneys may be withdrawn only over the counter-signature of Bankruptcy Judge Herzog.

11. Crook had previously given notice of motion, dated July 11, 1972, for an order directing LRS to pay him the sum he demanded as a secured creditor under the settlement agreement with Western Union. It appears that this effort was merged with, or abandoned as a consequence of, the filing of Claim No. 502. See note 12, *infra*.

ly preferring to rely on his contention that this was not dischargeable.

On the day after Crook filed Claim No. 502, LRS filed a motion seeking, *inter alia*, determination of the validity of certain liens of creditors who LRS believed had not filed claims. Included in the list was the lien asserted by Crook for $25,923.65, a lien said to be invalid on the following grounds:

> Claimed lien was not perfected; the alleged lien is voidable under Section 60 of the Bankruptcy Act; Claimant is not entitled to a lien under any circumstances; the assignment by the debtor to claimant is of no force and effect.[12]

While this motion was pending, Bankruptcy Judge Herzog ordered an interim distribution of the funds held by the disbursing agent. In that portion of his order of October 24, 1972, relevant to the case before this court, he ordered a "first or partial dividend" to the unsecured franchise creditors in the amount of 30% of their claims as scheduled in papers submitted by LRS. Excepted from this distribution were the claims of certain franchisees with respect to which LRS still had objections. When all objections were ultimately determined, said the court, a further distribution of the remaining cash and of the stock would be made to eligible unsecured creditors up to the maximum specified in the plan of arrangement. Included in the list of claims, classified as "*Class 'A' General Unsecured Claims Filed And Objected To*", upon which payment was not to be made, was Crook's Claim No. 502 for $25,923.65. His claim and others were deferred until further proceedings.

After hearing testimony and argument with respect to Crook's Claim No. 502, Bankruptcy Judge Herzog issued an opinion, dated April 20, 1973, in which he overruled LRS' objections to the claim, allowed it as a secured claim entitled to participate in the fund from the Western Union settlement established for such claims, and refused LRS' demand that Crook be enjoined from pursuing his action in Texas pending determination of the dischargeability of the alleged debt upon which it was predicated. LRS made two arguments, both rejected. The first was that, by filing the assignment with the County Clerk one day before entry of judgment against Western Union, Crook had not satisfied the requirements of New York Civil Practice Law and Rule § 5019(c) McKinney's Consol.Laws, c. 8,[13] which, being written in the past tense, was said to require filing after entry of judgment. The bankruptcy judge rejected any such rigid reading and held that the assignment "served to effect an assignment of the proceeds of the settlement to the extent of $25,-923.65." LRS' second argument was that under the assignment agreement of November 29, 1969, Crook could either enforce the assignment or pursue his Texas action but not do both. Judge Herzog held that, LRS having failed to meet the May 31, 1970, deadline for satisfaction of the assignment, Crook could pursue both remedies.

Before an order based upon this opinion was issued, LRS moved for reargument. Additional argument was heard

---

**12.** Upon receipt of Claim No. 502, LRS filed another motion objecting to that claim on the same grounds asserted in the motion of July 19. LRS indicated that any liability would be limited to the unsecured sum of $15,500, as shown in debtor's schedules. It appears that this motion was filed pursuant to an order of July 6, 1972, in which Bankruptcy Judge Herzog amended his order of confirmation to permit LRS to object to "claims proved and filed but not allowed or disallowed herein prior to the date hereof."

**13.** This provides in pertinent part:

> A person other than the party recovering a judgment who becomes entitled to enforce it, shall file in the office of the clerk of the court in which the judgment *was* entered . . . a copy of the instrument on which his authority is based . . .. Upon such filing the clerk shall make an appropriate entry on his docket of the judgment.

(Emphasis supplied).

but the bankruptcy judge refused to entertain additional evidence which had been available but was not introduced during the earlier hearings. LRS offered several new arguments why the assignment was not properly perfected. One was that the county clerk had noted the assignment only in his minute book of the Western Union action rather than on the docket sheet as required by N.Y. C.P.L.R. § 5019(c); LRS further objected that Crook failed to perfect his assignment by filing in compliance with Article 9 of the Uniform Commercial Code (UCC). The bankruptcy judge rejected both contentions, for reasons discussed in Part III below. He also rejected another argument that the assignment was voidable as a fraudulent conveyance in that it was made without adequate consideration by an insolvent debtor. He found that the consideration given for the assignment—a six-month adjournment of the Texas action—was perfectly adequate. He added that even if he were to consider an affidavit by Hoppenfeld addressed to the solvency question (part of the new but not newly discovered evidence he refused to admit), there would be inadequate proof of insolvency in the bankruptcy sense at the time of the assignment. On the reargument of Crook's right to press his larger claim while retaining the benefit of the assignment, the bankruptcy judge again found no ambiguity in the agreement, and reiterated his holding that the Texas action would not be "settled" upon belated payment to Crook of the amount of the assignment. However, noting that, upon the filing of the petition for an arrangement, Bankruptcy Judge Babitt had signed an order enjoining and restraining the commencement or continuation

of any suit against LRS, that one of his own orders had stayed the Texas suit against LRS, and that, in any event, Crook had in the meantime submitted the merits of that controversy for determination in connection with the as yet not held jury trial on dischargeability, Bankruptcy Judge Herzog held that any proceedings in the Texas action subsequent to Judge Babitt's order would be of no effect. For good measure, and pursuant to § 17c(4), Judge Herzog stayed continuation of the Texas action and any efforts to enforce a judgment, if any, against LRS.

The bankruptcy judge therefore ordered that Crook's Claim No. 502 be allowed as a secured claim in the amount of $25,923.65 plus interest and that a check in that amount be prepared for his countersignature out of the fund for secured claims. On review Judge Motley affirmed his findings in a brief opinion, and this appeal followed.

## II. *Jurisdiction of the Bankruptcy Court*

In a supplemental brief filed on this appeal, LRS raised for the first time the question of the jurisdiction of the bankruptcy judge to determine the validity of Claim No. 502.[14] It cited as authority Judge Werker's opinion in *Law Research Service, Inc. v. Hemba, supra,* 384 F.Supp. 729, where a post-confirmation order of Bankruptcy Judge Herzog invalidating a secured claim against LRS was vacated for want of jurisdiction of the bankruptcy court.

■ We note preliminarily that LRS' jurisdictional argument is largely misdirected[15] as regards the point about

---

14. Although in *Law Research Service, Inc. v. Martin Lutz Appellate Printers, Inc., supra,* 498 F.2d 836, we passed upon a post-confirmation determination of Bankruptcy Judge Herzog sustaining the validity of another partial assignment of the judgment against Western Union, the jurisdictional question was not raised.

15. We say "largely" because, if there were merit in LRS's contention that the filing of the

assignment did not meet U.C.C. requirements with respect to secured interests, it would become important whether the assignment was an outright transfer of an interest in the Western Union judgment, as Crook has consistently maintained, or simply, as LRS argues, security to afford collateral. However, in view of our holding in Point III *infra*, these questions become academic.

which it is most concerned, namely, the overruling of its contention that the assignment constituted a complete settlement of the Texas action so that, even if the assignment is valid, Crook is entitled only to the amount assigned plus interest. LRS has not argued, and could not reasonably argue, that, if the assignment was valid, it did not make Crook a secured creditor with respect to the sum assigned; its argument concerning the interpretation of the agreement is that Crook could have no more. Acceptance of this argument would have required the bankruptcy judge to modify his order of December 9, 1971, which permitted Crook to pursue his claim for $94,900 on the ground of nondischargeability under § 17a(2), and to foreclose that remedy if the secured claim were allowed. This was clearly within the jurisdiction of the bankruptcy court. In addition to the general provision of § 302 which makes Chapters I to VII applicable in Chapter XI proceedings insofar as they are not inconsistent with the provisions thereof, § 371 expressly states that "the confirmation of an arrangement shall discharge a debtor from all his unsecured debts and liabilities provided for by the arrangement, except as provided for in the arrangement or the order confirming the arrangement, but excluding such debts as, under section 17 of this Act, are not dischargeable." It does not matter in this regard that a creditor also seeks to participate in the arrangement proceeding; such participation does not affect the nondischargeability of the debt. See *Friend v. Talcott*, 228 U.S. 27, 39, 33 S.Ct. 505, 508, 57 L.Ed. 718 (1913) (In a case involving a composition under former §§ 12 and 13, where it was argued that a creditor had to elect his remedy as between participating in the composition or pursuing his allegedly nondischargeable debt procured by fraud, the Court said: "Section 17 enumerates the debts not affected by a discharge; that is, those exempted from its operation. It is apparent that the exemptions do not rest upon any theory of the exclusion of the creditor from the

bankrupt act, or of deprivation of right to participate in the distribution, but solely on the ground that, although such rights are enjoyed, an exemption from the effect of the discharge is superadded."); *North American Factors Corp. v. Motty Eitingon, Inc.*, 105 N.Y.S.2d 250, 254–55 (Sup.Ct.) (where creditor participated in arrangement, "the right to sue for the alleged fraud survived the arrangement procedure.", aff'd, 279 App. Div. 719, 108 N.Y.S.2d 338 (1st Dept. 1951) (per curiam), aff'd, 304 N.Y. 901, 110 N.E.2d 733 (1953); 9 Collier, Bankruptcy ¶ 9.32(7), at 399 (14th ed. 1972).

In his opinion in *Hemba*, Judge Werker held that the bankruptcy court lacked jurisdiction to determine the Hembas' secured claim as assignees of a part of the settlement after confirmation of the arrangement. He found that none of the statutory provisions of Chapter XI could be a basis for jurisdiction over the Hembas' claim. The plan did not retain jurisdiction under § 368 and, since the Hembas never filed a claim, secured or unsecured, in the arrangement proceeding but had been brought into it by LRS' motion to determine the validity of liens, their claim could not be said to be "affected by" the plan of arrangement for jurisdictional purposes under § 369. While it appeared that the Hembas had consented to the jurisdiction of the bankruptcy court for the determination of their secured claim, § 2a(7), Judge Werker found any such consent unavailing for jurisdictional purposes since the court's jurisdiction, however derived, is limited to the adjudication of controversies having some proper relation to the business with which the bankruptcy court is entrusted. In the case before him, the judge said, the proper subject matter over which the jurisdiction of the bankruptcy court was invoked was the claims of unsecured creditors, claims to be satisfied by means of a plan of arrangement. While in some cases successful objection to secured claims might benefit unsecured creditors, on the facts here "there is no basis for any distribution to credi-

tors in the event debtor succeeds upon its claims, and thus, no way a determination of the claims could contribute to effectuation of debtor's plan of arrangement." 384 F.Supp. at 735. Therefore, since the enforceability of this secured claim "is an issue having no proper relation to the business with which that Court was entrusted . . ., any consent to more extensive jurisdiction that might be inferred from the Hembas' actions below is of no effect." *Id.* at 734.

■ In a later decision, *Law Research Services, Claim of Bengert, supra* note 1, Judge Werker reached a different result with respect to jurisdiction. Unlike the Hembas, but like Crook, Bengert did file a secured claim. The judge began his reasoning by noting that the filing of a secured claim "represents, in effect, the filing of an unsecured claim with respect to so much of the debt as is not covered by claimant's security interest", see 3 Collier, Bankruptcy ¶ 57.07[3.3], at 181–82; 9 *id.* ¶ 7.10[2], at 55; *id.* ¶ 7.05[4]; *id.* ¶ 8.01[3]; *United States v. National Furniture Co.*, 348 F.2d 390, 392–93 (8 Cir. 1963); *William H. Wise Co. v. Rand McNally & Co.*, 195 F.Supp. 621, 624 n. 1 (S.D.N.Y.1961). In ordinary bankruptcy this empowers the bankruptcy court to determine the validity of the claim for security and to allow as an unsecured claim the excess of the claim over the value of the property subject to a valid security interest, which would be zero if the security interest were invalid. Subject to the limitation of § 355,[16] the same may properly be done in a Chapter XI proceeding, even after confirmation and without a reservation of jurisdiction in the plan, despite the provisions of §§ 306(1) and 307(1) limiting the effect of Chapter XI proceedings to unsecured debts, see *SEC v. United States Realty & Improvement Co.*, 310 U.S. 434, 452, 60

S.Ct. 1044, 84 L.Ed. 1293 (1940); 9 Collier, Bankruptcy ¶ 7.05[4], at 29 (14th ed. 1972). If the bankruptcy court thus has jurisdiction to invalidate a claim to a secured interest in a Chapter XI proceeding under these circumstances, it would follow, although, in view of his holding against the validity of Bengert's lien, Judge Werker did not have to reach the issue, that it has jurisdiction to validate such a claim, since any other conclusion would waste the time of courts and litigants. In Mr. Justice Holmes' pithy phrase, "Jurisdiction is authority to decide the case either way." *The Fair v. Kohler Die & Specialty Co.*, 228 U.S. 22, 25, 33 S.Ct. 410, 411, 57 L.Ed. 716 (1913).

■ We find no fault with this reasoning in cases to which it applies. Here, however, although the record is murky, there is at least some question whether it would be reasonable to construe Crook's action in filing his secured claim for $23,923.65 as a request that if the bankruptcy court found the secured interest invalid, it should allow the claim as an unsecured one, entitled to participate in the arrangement in the amount of $15,500, which was all that § 355 permitted under the circumstances, see note 16. Moreover, the theory of *Bengert* affords no solution to cases like *Hemba; Law Research Service, Inc. v. United States Fidelity & Guaranty Co., supra* note 1, where Judge Cannella, on the authority of *Hemba*, vacated another order of Bankruptcy Judge Herzog, which on this occasion overruled an objection to a secured claim that had not been filed; and *In re Law Research Service, Inc., Claim of Saxer*, where the bankruptcy judge, in obedience to these decisions, reluctantly dismissed the debtor's objections concerning the assignment of another creditor who had not filed a claim.[17]

---

**16.** So far as here pertinent, this provides:

Creditors . . . shall file their proofs of claim before confirmation except as follows:

(1) if scheduled by the debtor, a claim may be filed within thirty days after the date of mailing notice of confirmation to creditors

but shall not be allowed for an amount in excess of that set forth in the debtor's schedules.

**17.** In his opinion in *Saxer*, the bankruptcy judge noted his dilemma in that he could not conscientiously countersign checks on the fund reserved for secured creditors without

■ Despite the contrary view taken in *Hemba, supra*, 384 F.Supp. at 733–34, we could dispose of the jurisdictional point in this case on the basis of consent.[18] Section 2a(7) provides:

> The courts of the United States . . . are hereby invested . . . with such jurisdiction at law and in equity as will enable them to exercise original jurisdiction . . . to—
>
> \* \* \* \* \* \*
>
> Cause the estates of bankrupts to be collected, reduced to money, and distributed, and determine controversies in relation thereto, except as herein otherwise provided, and determine and liquidate all inchoate or vested interests of the bankrupt's spouse in the property of any estate whenever, under the applicable laws of the State, creditors are empowered to compel such spouse to accept a money satisfaction for such interest; and where in a controversy arising in a proceeding under this Act an adverse party does not interpose objection to the summary jurisdiction of the court in bankruptcy, by answer or motion filed before the expiration of the time prescribed by law or rule of court or fixed or extended by order of court for the filing of an answer to the petition,

motion or other pleading to which he is adverse, he shall be deemed to have consented to such jurisdiction.

LRS' claim against Western Union was part of its estate which the bankruptcy court was to collect, reduce to money and distribute, although in a Chapter XI proceeding it could not alter the rights of any creditor having a secured claim against it. The question of the validity of Crook's lien must be determined somewhere before the bankruptcy court can distribute the fund deposited by Western Union for claims of this sort— either by summary action of the bankruptcy court or by plenary suit. The final clause in § 2a(7) means to us that LRS, having invoked summary jurisdiction, should not be allowed to challenge this once decision goes against it. To be sure, the Advisory Committee's Note to Rule 915, implementing § 2a(7), which Judge Werker cited in *Hemba*, says that the rule does not "apply to the making of an objection to the court's jurisdiction over a controversy that does not arise in the course of or relate to the administration of the estate of an adjudicated bankrupt or his discharge", but our statement of the facts and our subsequent discussion show that this was not the situation here.[19] The Western Union

---

satisfying himself of their entitlement, yet was precluded by the district court's decisions from doing this in cases where, although LRS had objected, the creditor had not filed a claim.

18. LRS has followed a wavering and seemingly irresponsible course with respect to the summary jurisdiction of the bankruptcy court to determine the validity and amount of secured claims. Initially it invoked such jurisdiction by filing objections both where secured claims had been filed and where they had not. In this case it raised the jurisdictional objection only after the unfavorable decisions of the bankruptcy judge and the district court. In *Hemba* the creditors first objected to jurisdiction while LRS asserted it; later both parties altered their positions, see 384 F.Supp. at 731. In our view LRS's proposal of the Western Union settlement as the basis for the arrangement was an irrevocable consent to the jurisdiction of the bankruptcy court.

19. The *Hemba* opinion, 384 F.Supp. at 734, quoted 1 Collier, Bankruptcy ¶ 2.09, at 178 (14th ed. 1974), for the proposition that the bankruptcy court's jurisdiction "is not such as to enable [it] to entertain a plenary suit in equity to adjudicate controversies having no proper relation to the business with which it is entrusted," but we are unable to see the bearing of this general statement, and the opinion ignores other parts of the treatise which tend to support consent jurisdiction in this case. For instance, ¶ 2.40[1.1], entitled "Implied Consent to Summary Jurisdiction", advocates a generous reading of the final clause of § 2a(7), and 2 *id.* ¶ 23.08, which further develops this theme, notes generally that "[i]t is well settled that in all cases where a party is entitled to the determination of his rights in a plenary action, he may nevertheless consent to the exercise of summary jurisdiction by the bankruptcy court and in that manner have his rights adjudicated." It is true that where

settlement played a key role in the arrangement. Moreover, the bankruptcy judge had to pass on the validity of Crook's secured claim in order to rule on LRS' objection to Crook's being allowed to pursue his $94,900 claim against the reorganized company—an objection over which, as previously developed, he plainly had jurisdiction. However, we think it desirable also to place our decision on an alternate ground which will allow the bankruptcy judge to perform his duties whether there is consent or not.

Apart from the general principle, already mentioned, that in a proceeding under Chapter XI the bankruptcy court cannot affect secured claims, which is not at all the same as saying that it cannot determine their validity and amount to the extent that this is necessary or appropriate to the formulation or consummation of an arrangement, LRS' jurisdictional argument rests on several provisions of Chapter XI. We start with the direction in § 367(4) that, upon confirmation, "except as otherwise provided in sections 369 and 370 of this Act, the case shall be dismissed." Then comes § 368, which says that "[t]he court shall retain jurisdiction, if so provided in the arrangement." See § 357(7). This is of

no help here since the arrangement did not so provide, although the order of confirmation did, since the former governs.[20] On the other hand, the absence of an effective provision for retention of jurisdiction in the plan is not nearly so devastating as it might seem. Collier tells us in somewhat Kafkaesque terms, 9 Collier, Bankruptcy ¶ 9.29[2], at 369 (14th ed. 1972) (footnote omitted), that:

> The question arises as to what is meant by retention of jurisdiction. That does not mean that if the arrangement does not provide for retention of jurisdiction the court has no jurisdiction after confirmation. Nor does it mean that if the arrangement does provide for retention of jurisdiction after confirmation the court continues to have all the jurisdiction it theretofore possessed . . .. As a result of § 367(4), moreover, it is clear that even where retention of jurisdiction is provided for in the arrangement, the court does not continue to have all the jurisdiction it theretofore possessed, but that some of that jurisdiction is lost. It has the jurisdiction, already indicated, which it would have even if retention of jurisdiction were not provided for, and in addition it has

there is an entire lack of bankruptcy jurisdiction, consent is not operative, but the limited character of this principle is illustrated in the cases cited in *id.* n. 7. The cases cited in the *Hemba* opinion, 384 F.Supp. at 734, are likewise inapposite. For instance, in *Smith v. Chase National Bank*, 84 F.2d 608 (8 Cir. 1936), the bankruptcy court was held properly to have dismissed petitions of appellants, who were not creditors of the bankrupt and had no other claim of title or right to possession of the bankrupt's assets and the property in question was not in the custody of the court. In declining to assume jurisdiction over the controversy involving third parties, the court said that "[i]t would be difficult to imagine a controversy in which the court below would have less practical reason to be interested." *Id.* at 613. In *Central Hanover Bank & Trust Co. v. Kelby*, 133 F.2d 873 (2 Cir. 1943), the petitioner, trustee of a trust indenture which had its claim allowed, sought a declaration from the bankruptcy court of what disposition it ought to make of the dividends received on

the claim it asserted, over the objection of the trustee in bankruptcy, who was concerned that the effort expended in obtaining such an order would unduly delay closing of the estate. There was, said Judge Clark in affirming denial of the petition, "no dispute which concerns the bankrupt estate." *Id.* at 875. And in *Sylvan Beach v. Koch*, 140 F.2d 852, 861 (8 Cir. 1941), the court acknowledged the general rule that it "has no jurisdiction to hear and determine controversies between adverse third parties which are not strictly and properly part of the proceedings in bankruptcy," but it also recited the rule that "[i]t has jurisdiction to adjudicate controversies relating to property of which it has actual or constructive possession."

**20.** *Texas Consumer Finance Corp. v. First National City Bank*, 365 F.Supp. 427, 429 n. 2 (S.D.N.Y.1973); *In re Oceana Int'l, Inc.*, 376 F.Supp. 956, 959 (S.D.N.Y.1974); 9 Collier, Bankruptcy ¶ 8.12, at 183–84 & n. 3, ¶ 9.29[1], at 368–69 (14th ed. 1972).

only the jurisdiction conferred by §§ 344 and 377.[21]

Section 369 provides:

> The court shall in any event retain jurisdiction until the final allowance or disallowance of all claims affected by the arrangement which have been filed within the limitations as to time and amount prescribed by section 355 but have not been allowed or disallowed prior to confirmation.

and § 370 directs that:

> Upon the allowance of any debts specified in paragraphs (1), (2), and (3) of section 369 of this Act, the consideration, if any, deposited for them shall be distributed and the rights provided by the arrangement shall inure to the creditors to whom such debts are owing.[22]

While, as previously indicated, § 369 can be read to include a claim such as that in *Bengert*, even though it was filed as a secured claim, as Judge Werker held in that case, it is more doubtfully applicable to the claim here at issue and surely could not cover the case where no claim was filed at all.

■■■ We think, however, that at least on the peculiar facts of this case the bankruptcy court had and retained jurisdiction to take whatever action was necessary and appropriate to distribute the fund provided by the Western Union settlement. The amount paid by Western Union was the very cornerstone of the LRS Chapter XI arrangement. Western Union wanted to be rid of its problems with LRS—not to be exposed to continued litigation requiring it to interplead LRS and numerous assignees to determine the validity and affect of their assignments. It was thus an essential part of the Western Union settlement that the LRS arrangement should provide "appropriate procedures so that sufficient funds will be set aside to en-able the satisfaction of claims of allegedly secured creditors to the extent that their claims may be allowed and fixed, which funds will be subject to the jurisdiction of the Bankruptcy Court and all vouchers relative thereto shall require the counter-signature of the Referee in Bankruptcy." It is doubtful that settlement could have been made without this provision whereby the claims of creditors holding assignments of LRS' judgment should be determined in an orderly and expeditious manner. As the Third Circuit has noted with respect to the authority of the bankruptcy court to collect and distribute the bankrupt's estate and to determine controversies relative thereto under § 2a:

> The tendency of judicial interpretation of the Act has been in the direction of progressive liberalization in respect of the operation of the bankruptcy power so as to meet the challenge of present day economic and business conditions.

*In re International Power Securities Corp.*, 170 F.2d 399, 402 (3 Cir. 1948). The challenge presented by this arrangement proceeding clearly calls for a liberal rather than niggardly view of the court's jurisdiction. In other instances bankruptcy court jurisdiction has been expanded to meet the exigencies of particular fact situations. Thus a bankruptcy court may even have summary jurisdiction over controversies solely between third parties in unusual circumstances when, without their determination, reorganization cannot proceed. See *In re Burton Coal Co.*, 126 F.2d 447 (7 Cir. 1942); *In re International Power Securities Corp., supra*, 170 F.2d at 403; *O'Dell v. United States*, 326 F.2d 451, 455 (10 Cir. 1964); *In re Brookwood Country Club*, 338 F.2d 562, 564 (7 Cir. 1964). Contrast *Richmond v. United States*, 456 F.2d 458 (3 Cir. 1972) (in Chapter XI proceeding bankruptcy court could not determine such controversies where there was no adequate showing that,

---

21. Neither of these sections is relevant here.

22. The reference to paragraphs (1), (2) and (3) of § 369 was to its form prior to amendment in 1967, Act of Nov. 28, 1967, § 4, 81 Stat. 510.

without determination of the third party dispute the arrangement could not proceed). *A fortiori* it may exercise such jurisdiction to determine the validity of a secured claim when this is necessary for the consummation of a Chapter XI arrangement, even though it has no power to require a secured creditor to take less than the full amount of his claim and although in the particular case invalidation of the secured claim will not benefit unsecured creditors.

Section 311, a part of Chapter XI, provides:

> Whe[n] not inconsistent with the provisions of this chapter, the court in which the petition is filed shall, for the purposes of this chapter, have exclusive jurisdiction of the debtor and his property, wherever located.

We have given this clause a broad reading.[23] *In re Koch*, 116 F.2d 243 (2 Cir. 1940), *cert. denied sub nom. Hirson v. Koch*, 313 U.S. 565, 61 S.Ct. 941, 85 L.Ed. 1524 (1941); *In re White Plains Ice Service, Inc.*, 109 F.2d 913 (2 Cir. 1940). Once the Chapter XI proceedings of LRS began creditors holding assignments of its claim or judgment against Western Union could not simply require payment by Western Union without leave of the bankruptcy court any more than the conditional vendor in *White Plains Ice Service, Inc.* could repossess without similar leave. See also *Murphy v. John Hofman Co.*, 211 U.S. 562, 569, 29 S.Ct. 154, 53 L.Ed. 327 (1909). Once possession of the property constituting the security has passed into the hands of the bankruptcy court, even secured creditors may assert their claims against it only in or by leave of that court. 3 Collier, Bankruptcy ¶ 57.07[3.3], at 182–83 (14th ed. 1974). And that court could not properly grant leave for payment without satisfying itself, in a summary proceeding, of the validity and amount of the creditor's interest. Presumably no one would have challenged the power of the bankruptcy

court to pass on the validity of Crook's secured claim prior to confirmation of LRS' arrangement. It is clear beyond cavil, to return again to a familiar theme in ordinary bankruptcy with respect to the determination of controversies under § 2a(7), that "[i]f the property or fund is in the possession of the court, . . . controversies with respect thereto are clearly within its jurisdiction." 1 *Id.* ¶ 2.46, at 276–78. It would be a distorted reading of the statute to think that confirmation necessarily changed all this, left the bankruptcy court powerless to discharge duties it had properly assumed with respect to the fund for secured creditors under the Western Union settlement agreement, and remitted the debtor and its secured creditors to a series of time-consuming plenary proceedings.

■ A contention very similar to LRS' was rejected on these grounds by this court a half century ago. *In re Kalnitzsky Bros. & Oppenheim*, 285 F. 649 (S.D. N.Y.) (L. Hand, *D. J.*), aff'd per curiam, 285 F. 652 (2 Cir. 1922). There an involuntary petition in bankruptcy had been filed and a receiver appointed but a composition was confirmed prior to any adjudication. A creditor had made claim against goods in the possession of the receiver which it contended the bankrupts had acquired by fraud. The court had not passed on this claim prior to confirmation of the composition and the bankrupts argued that, with the confirmation of the composition, the court lost jurisdiction, that the petition of the creditor would therefore not lie, and that the goods must be returned to them. Judge Hand dismissed this contention as follows, 285 F. at 651:

> Now, I conceive that it is the duty of all courts, before taking any action, and the surrender of property is an affirmative step, to ascertain whether that action will respect or violate any

---

**23.** In speaking of § 111, which is the comparable provision in Chapter X proceedings and which is virtually identical in wording to § 311, the Third Circuit expressly adopted the broad language quoted above in text from *In re International Power Securities Corp., Inc.*, supra. *In re Imperial "400" National, Inc.*, 429 F.2d 671, 677 (3 Cir. 1970).

individual rights of which it may have become aware. Else its action may result in legal wrongs which it should be its uniform effort to avoid. A court must always award to each his own; "suum cuique tribuere." Indeed, by virtue of 'its possession it has come to be in the position of a plaintiff in interpleader, immune it is true, from legal redress, but not immune from responsibility for acting lawfully, from correctly choosing that person who is entitled to its favor. It cannot so act without making inquiry into the relative rights of the conflicting claimants. The confirmation does not affect the situation at all. The bankrupts are indeed entitled to repossess their own goods, but not the goods of others. How can it be ascertained what were their goods till the claims be heard? The very performance of the court's duty involves the sifting of claims. It is an inherent condition of the execution of the composition in itself. Nothing of the sort arises as to goods out of its possession, because the court is not called upon to take any action as to these.

That decision was followed by Judge Mathes in a Chapter XI case, *In re Kessler*, 90 F.Supp. 1012 (S.D.Cal.1950). Although there the plan as well as the amended order of confirmation had provided for retention of jurisdiction, the judge considered that to be immaterial, 90 F.Supp. at 1015. It is true that in *Kessler* the plan provided that any sums resulting from sale of the mortgaged property should pass to the unsecured creditors if the mortgage were held invalid, whereas under LRS' arrangement invalidation of secured claims will not increase the awards to unsecured creditors but will augment the property of LRS, since, absent express provision to the contrary, any money left after distribution required by a plan of arrangement reverts to the debtor. See Advisory Committee's Note, Chapter XI, Rule 11–35, in U.S.C.A. Bankruptcy Rules and Official Bankruptcy Forms, at 243 (1974). But, with all respect to the contrary view taken in *Hemba*, 384 F.Supp. at 735, we fail to see how this avoids the principle so forcefully stated by Judge Hand—that a bankruptcy court, having taken possession of property, cannot properly hand it to one of two conflicting claimants without determining who is entitled to receive it.

We do not find *In re Oceana International, Inc.*, 376 F.Supp. 956 (S.D.N.Y. 1974), on which Judge Werker heavily relied in *Hemba*, to be to the contrary. Although the facts in that case were complicated, what was involved was the court's refusal to sanction an attempt by a debtor, after confirmation of an arrangement in a second Chapter XI proceeding, to utilize summary procedure for the recovery of assets that had been sold by a bank mortgagee, with court approval, during an intervening ordinary bankruptcy that had superseded an earlier aborted Chapter XI proceeding. The bank had objected to the jurisdiction of the court to determine the issues raised by summary procedure and it was clear that no argument with respect to consent could be made out. Moreover, the property in question was in no sense in the possession of the court in the second Chapter XI proceeding. The debtor acknowledged "that its proceeding against the Bank was plenary, normally involving all the attributes of a court trial", 376 F.Supp. at 959, but sought to escape this on various grounds so plainly untenable that extended discussion was scarcely required. Any comfort obtainable by LRS from this opinion comes from isolated passages in which Judge Weinfeld may have said more than was needed to support his manifestly correct rejection of the debtor's position and which have no bearing on the completely different facts presented here.

### III. *The Validity of the Assignment*

■ It would seem at first blush that any question whether the partial assignment of the Western Union judgment was so perfected as to constitute a valid lien, even assuming it was a "security interest" within New York Uniform

Commercial Code § 1–201(37), McKinney's Consol.Laws, c. 38, had been settled by *Law Research Service, Inc. v. Martin Lutz Appellate Printers, Inc., supra*, 498 F.2d 836.[24] That case involved an assignment of $20,000 of the Western Union judgment to assure Lutz of payment for services in printing a brief and record for LRS on Western Union's appeal of the judgment. Although Lutz had endeavored to file the assignment with the county clerk pursuant to N.Y.C. P.L.R. § 5019(c) more than four months prior to LRS' bankruptcy, the clerk refused to receive it until a date within the four-month period. This court held that filing pursuant to the N.Y.U.C.C. was not required since § 9–104(h) excludes from application of the requirements of Article 9 "a right represented by a judgment"; that under such circumstances pre-Code law continues to govern; that N.Y. General Obligations Law § 13–103, McKinney's Consol.Laws, c. 24–A, authorizing the assignment of judgments, does not require filing of any sort; and that, apart from any question whether Lutz should be penalized for the clerk's initial refusal to file the assignment, N.Y.C.P.L.R. § 5019(c) was intended for the protection of the assignee and "not as a means of providing notice to third-party creditors."[25]

Such problem as there is arises from the fact that, in his opinion in the *Hemba* case, rendered six weeks after the *Lutz* decision, without making reference to it or to the "right represented by a judgment" exception in N.Y.U.C.C. § 9–104(h), Bankruptcy Judge Herzog had reclassified as unsecured an assignment of a portion of the Western Union judgment serving as collateral for collection of an earlier consent judgment on the ground of failure to perfect by filing in the manner which N.Y.U.C.C. § 9–103 requires for general intangibles. In light of the bankruptcy judge's contrary rulings in this and in the *United States Fidelity & Guaranty* cases, not to speak of this court's decision in *Lutz*, this must have been inadvertent. There was thus no lack of perfection even if the assignment to Crook was a security interest, which, as developed in Part IV, we do not think it was.

LRS further contends that if, as Crook maintains, the assignment was a conveyance absolute made solely in consideration of a six-month delay of the Texas action, it would be a fraudulent conveyance and consequently void as against creditors. Apart from other considerations, there was no admitted evidence that at the time of the assignment LRS was insolvent in the bankruptcy sense. Bankruptcy Judge Herzog ruled that he would not consider an affidavit of Hoppenfeld submitted on the motion for reargument which purported to demonstrate such insolvency. While that ruling seems proper enough since the evidence was not newly discovered, the affidavit is unpersuasive in any event. Appended to it were financial statements which showed that liabilities exceeded assets by a mere $1,660.78. And in the

---

**24.** The only qualification is that whereas in *Lutz* the assignment was executed more than seven months after the Western Union judgment, the assignment in this case antedated the judgment awarding damages against Western Union by several months, a point LRS has not raised. See 498 F.2d at 836 & n. 6. LRS had argued in *Lutz* that there was no perfectable transfer when the assignment was given since there was at that time no separate and identifiable fund and the judgment might be upset on appeal. On authority of *Stathos v. Murphy*, 26 A.D.2d 500, 276 N.Y.S.2d 727 (1st Dept. 1966), aff'd, 19 N.Y.2d 883, 281 N.Y.S.2d 81, 227 N.E.2d 880 (1967), Judge Mansfield held that "the assignment of *an existing judg-*

*ment* is of a present, not future interest," 498 F.2d at 838 (emphasis added), and thus not subject to the difficulties some courts have encountered in determining when rights in the latter category accrue. If this point of alleged distinction had been raised here, it would doubtless have been a sufficient answer that the judgment was entered more than four months before the filing of LRS's Chapter XI petition. See *Okin v. Isaac Goldman Co.*, 79 F.2d 317, 319–20 (2 Cir. 1935).

**25.** In his opinion on reargument in this case, rendered six months prior to *Lutz*, Bankruptcy Judge Herzog had ruled to this effect.

"judgments receivable" entry section of the statements there were only references to certain "notes" of the accountant, which apparently were not furnished. The balance sheet thus made no provision for the value of the claim against Western Union, which LRS clearly and, as matters turned out, correctly thought worth much more than the supposed excess of liabilities over assets. Indeed, the certified public accountant who prepared the statements said that, because of the material effect which the recovery of damages from Western Union might have on the statements, he was unable to express an opinion about them.

## IV. *Crook's Right to Pursue his $94,900 Claim*

LRS takes serious issue with Bankruptcy Judge Herzog's interpretation of the November 28, 1969, agreement to the effect that the assignment was given in consideration for an adjournment of Crook's Texas action and that, having failed to meet the payment deadline specified in the agreement, LRS may not require Crook to abandon the claim there asserted if he wants to enforce the assignment. LRS argues that a mere adjournment of the trial of Crook's action for a few months would have been a shockingly inadequate consideration for an absolute assignment of $25,923.65 and that the agreement was in fact an "executory accord" under which Crook must choose which remedy—enforcing the assignment or proceeding upon his original claim—he wants to pursue. In support of this LRS presented testimony of an officer, Paul Weiner, who participated in the negotiations which led to the signing of the agreement, that both sides intended to make an agreement that would settle both Crook's suit in Texas and his status as a franchisee. The witness said that he had objected to the original draft of the agreement because "it did not appear to state that it was in full settlement of the claims asserted by Mr. Crook." Weiner added that Crook's attorney agreed to make changes to satisfy him; he could not "recall the exact wordings that were changed but [knew] there were some words put in to the effect that this was a settlement of the contractual dispute." The adjournment provision, according to Weiner, was inserted simply "in order for that action not to continue pending this settlement." During the hearings before Bankruptcy Judge Herzog special counsel for LRS further argued that the adjournment was not consideration but was merely "a routine litigation device to give the defendant a reasonable chance to raise funds to pay the claim in full."

If LRS wanted the agreement to make clear that Crook could have the benefit of the assignment or pursue his lawsuit if he was not paid $25,923.65 plus interest by May 31, 1970, but not both, it was highly unsuccessful in doing so. What it asks us to do is not to interpret the agreement but to amend it. In effect LRS wishes us to add the following language (emphasized): "Plaintiff shall adjourn the trial . . . to May 31, 1970, at which time, if the aforesaid assignment has not been paid in full, the plaintiff may proceed to the trial . . . as if this Agreement had not been executed, *but in such event this assignment shall become null and void.*"

Even if we were free to decide the case entirely on the equities and without regard to the language, LRS' argument is not quite so impressive as it may seem; to some extent it represents an appraisal in the light of 20–20 hindsight. LRS was not paying outright $25,923.65 for a six months adjournment;[26] it was

---

**26.** While it is not clear why LRS was willing to pay even this much, Crook's counsel suggests such a reason in his brief: "This delay was of utmost importance to the Debtor, who was at that moment attempting to establish in the action against Western Union that the damages sustained by its franchisees should be paid by Western Union as additional and consequential damages flowing from Western Union's breach, rather than from fraudulent representations made by Debtor, its President and its agents, as alleged . . . in the Tex-

making an assignment in that amount of a judgment of a court of first instance, with respect to liability only, that was certain to be appealed. Even on May 31, 1970, judgment had not yet been entered, since the New York court was awaiting the report of a special referee with respect to the amount of damages LRS suffered as a result of Western Union's breach, and appeal remained ahead. Whether Crook would ever realize anything on the assignment was wholly uncertain at that time. Moreover, LRS received, in effect, a limitation on the damages it would have to pay Crook if it could make payment on or before the deadline date; to be sure, it was by no means certain that Crook would have succeeded in obtaining all of what he sought if the Texas action had then been tried, but an upper limit on liability subject to a condition subsequent within its control was of some value to LRS. LRS responds that Crook was protected since the $25,923.65 was drawing interest of 8 per cent which he would have been paid if he had accepted LRS' alleged offer of payment in the fall of 1970. But Crook could answer that by that time, after entry of judgment in favor of LRS in the New York court in a sum in excess of $1 million, he had decided that the value of his speculation on the prospects concerning the Western Union judgment had improved and that he was not bound to afford LRS a grace period for which it had not successfully bargained.

 Our task, however, is not to pass on the equities, save as these may bear on meaning, but to construe the agreement. Crook contends that the interpretation of the agreement by the bankruptcy judge was a finding of fact protected by the "unless clearly erroneous" rule, 2A Collier, Bankruptcy ¶ 39.28, at 1532–33 (14th ed. 1974), particularly

after affirmance by a district judge, *id.* § 25.30, at 1024. Although statements to that effect can doubtless be found in the books, see the cases collected in 5A Moore, Federal Practice ¶ 52.03[1], at 2634–35 n. 26 (2d ed. 1974), we continue to abide by Judge L. Hand's observation that, whatever a finding of *meaning* may be called, "such a finding is assailable as an ordinary finding of fact is not; for appellate courts have untrammelled power to interpret written documents." *Eddy v. Prudence Bonds Corp.*, 165 F.2d 157, 163 (2 Cir. 1947), *cert. denied*, 333 U.S. 845, 68 S.Ct. 664, 92 L.Ed. 1128 (1948). See *Cordovan Associates, Inc. v. Dayton Rubber Co.*, 290 F.2d 858, 860 (6 Cir. 1961); *Standard Title Ins. Co. v. United Pacific Ins. Co.*, 364 F.2d 287, 289 (8 Cir. 1966); *Emor, Inc. v. Cyprus Mines Corp.*, 467 F.2d 770, 773 (3 Cir. 1972); *Motor Carriers Council of St. Louis, Inc. v. Teamsters Local No. 600*, 486 F.2d 650, 653 (8 Cir. 1973); *Teamsters Local No. 688 v. Crown Cork & Seal Co., Inc.*, 488 F.2d 738, 740 (8 Cir. 1973); *Stamicarbon, N. V. v. American Cyanamid Co.*, 506 F.2d 532, 537 (2 Cir. 1974). Even on that basis, however, we find the interpretation given to the agreement below to be entirely proper. The "whereas" clause stated that the defendants in the Texas action "are desirous of adjourning the trial" until the date stated; the assignment was given to procure this. While paragraph 2 says that "plaintiff may proceed to the trial . . . as if this Agreement had not been executed," as pointed out before, it does not say that the assignment was thereupon voided—language that Hoppenfeld, an experienced attorney, could readily have drafted. The failure of the agreement to say *in ipsissimis verbis* that Crook may have the benefit both of the assignment and of the action if prompt payment was not

as action." In line with this Crook's counsel had elaborated during argument before the bankruptcy judge that during the period of the adjournment, November 1969 through May 1970, a special referee was computing damages in the Western Union action. The referee rendered his report in May and judgment was issued in June. This, while he was computing

damages, the special referee did not have before him any evidence, which Crook might have developed in the Texas trial, about the alleged fraudulent acts of LRS, damages arising from which could not be charged to Western Union. However, we find it unnecessary to rely on any of this.

made is not forceful. The agreement clearly does permit Crook to continue his suit if the agreed amount was not paid by the stipulated date, and it was unnecessary for it to say that the assignment remained valid since, by virtue of the agreement's silence on this point and the failure of the assignment itself to mention conditions or dates, that would necessarily be the case. The language was thus of a "conditional settlement," as Crook's counsel calls it. Crook agreed to abandon his claim if a specific condition was met; that conditions not having been met, LRS cannot require a general release upon a belated offer to pay the specified sum plus interest. Against all this there was only the inconclusive testimony of Weiner. With respect to such testimony the "unless clearly erroneous" rule does have a role to play, and we certainly cannot say that the bankruptcy judge's evident failure to credit that testimony was clearly erroneous. Whether the amount realized by Crook from the assignment should be credited against any recovery he may make against LRS if he should prevail on his allegedly undischarged claim is not now before us and may never be.

Affirmed.